Maria WALTERS; William Walters; Cesar Corona–Alvarez; Antonio Alvarez; Ninfa de Adames, Guadalupe Adames, husband and wife; Camila Garcia–Cruz; Omar Kayyam Meziab, Leslie Meziab, husband and wife, on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

v.

Janet RENO, Attorney General of the United States; Doris M. Meissner, Commissioner of the United States Immigration and Naturalization Service; United States Immigration and Naturalization Service, Defendants–Appellants.

No. 96–36304.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1997.

Decided May 18, 1998.

Karen Fletcher Torstenson, Asst. U.S. Atty., Washington, DC, for defendants-appellants.

Linton Joaquin, Los Angeles, CA, for plaintiffs-appellees.

Before: GOODWIN and REINHARDT, Circuit Judges, and KING, Senior District

Judge.*

REINHARDT, Circuit Judge:

The Attorney General of the United States and other parts of the U.S. government (collectively, "the government") appeal from the district court's determination that certain administrative procedures employed by the Immigration and Naturalization Service ("INS") violated the constitutional requirements of due process. The government also appeals the district court's certification of the plaintiff class and the court's entry of permanent injunctive relief. We agree with the district court that the nationwide procedures by which the INS obtained waivers in document fraud cases violated the aliens' rights to due process of law. We also agree that certification of plaintiffs as a class under Fed. R.Civ.P. 23(b)(2) was appropriate. And although we modify one of the provisions in the injunction, we uphold its principal terms.

### Proceedings in the District Court

The plaintiffs brought suit against the government on behalf of themselves and similarly situated noncitizens, seeking declaratory and injunctive relief on the ground that the administrative procedures used by the INS to obtain final orders under the document fraud provisions of the Immigration and Naturalization Act of 1990 ("INA" or "the Act") violated their rights to procedural due process. Under § 274C of the Act, 8 U.S.C. § 1324c, the INS may issue an unappealable final order against an alien who has been accused of document fraud if the alien does not request a hearing in writing within 60 days of receiving the notice of intent to fine ("the fine notice") and the notice of rights/waiver ("the rights/waiver notice") forms. Such an order renders the alien deportable and permanently excludable. Deportation is automatic, except in narrowly limited circumstances. If the alien signs a statement waiving his rights with respect to the document fraud charges, including his right to a hearing, the INS will immediately issue an unappealable final order assessing a

fine and requiring the alien to cease and desist from his wrongful conduct, but the ultimate result that ordinarily will follow soon thereafter will be the issuance of an order of deportation.

In their complaint, the plaintiffs contend that despite the dramatic immigration consequences for those charged with violating the document fraud provisions of the INA, the forms served on aliens in connection with these charges are dense and written in complex, legal language. The plaintiffs allege that on account of the confusing nature of the forms, aliens in document fraud proceedings are not adequately informed of the steps they must take in order to contest the charges brought against them and thus do not learn how to obtain a hearing on them. Moreover, they allege, they do not learn the true consequences of failing to request that hearing. They also challenge the general procedures by which the forms are presented to them. The plaintiffs moved to certify a class of approximately 4,000 aliens who had been or were subject to final orders, and moved for the entry of a preliminary injunction, summary judgment, a permanent injunction, and an order requiring the INS to reopen each plaintiff's document fraud case and provide hearings if necessary.

In March 1996, Judge Coughenour certified the plaintiffs as a class with the following characteristics:

> All non-citizens who have or will become subject to a final order under § 274C of the Immigration and Naturalization Act because they received notice forms that did not adequately advise them of their rights, of the consequences of waiving their rights or of the consequences of failing to request a hearing.

Under the district court's order, an individual alien can establish his status as a class member by attesting that he did not understand either his rights in the document fraud proceedings or the consequences of waiving his rights. In the same order, Judge Coughenour ruled on summary judgment that the procedures and forms used by the INS in

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

document fraud cases are unconstitutional because they deny aliens their rights to due process of law. The court also granted permanent injunctive relief; the terms of the injunction were to be decided after the parties submitted proposals to the court.

In October 1996, Judge Coughenour entered final judgment in favor of the plaintiffs and granted a permanent injunction requiring the INS to take a variety of actions to remedy the constitutional violations. According to the terms of the injunction, the INS must: (1) revise the two misleading forms (the fine notice and the rights/waiver notice); (2) send notice to possible class members at their last known addresses, and, through a publicity campaign that must include specific attempts to contact all class members inside and outside of the country, publicize the opportunity for class members to reopen their document fraud proceedings; (3) refrain from deporting noncitizens on the basis of § 274C final orders that were entered without a hearing until class members have the opportunity to pursue reopening procedures; (4) reopen § 274C proceedings for each class member who was subject to a § 274C final order, unless the government can show that alien received adequate notice; (5) parole or make other arrangements for class members outside the United States to pursue reopened proceedings; and (6) recharge any alien charged with deficient forms who failed to request a hearing but has not yet been subjected to a final order, unless the government can show that the alien received adequate notice.

In its order certifying the class and finding due process violations, the district court did not resolve all of the claims raised by the plaintiffs. However, after the government moved for summary judgment in its favor on the remaining claims,[1] the district court stated in its order for a permanent injunction that "there is no reason to rule on the alternate grounds for that relief represented by the three issues defendants ask the Court to decide." The district court dismissed without prejudice the leftover claims.

The government challenges the district court's factual findings and legal conclusions *in toto*.

## DISCUSSION

■ Although there is no question that the United States has extraordinarily broad ▸powers in the area of immigration and border control, it is also well established that aliens facing deportation from this country are entitled to due process rights under the Fifth Amendment. *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). As the Supreme Court has explained on a number of occasions, "once [an] alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). Thus, the government is not free to deport an alien from the United States unless it has first accorded him the most basic procedural protections—notice and a hearing at a meaningful time and in a meaningful manner. *Id.* at 32–33, 103 S.Ct. 321.[2] The plaintiffs assert that the INS regularly violates these constitutional precepts in the context of document fraud proceedings.

At the heart of this case is the plaintiffs' allegation that the procedures by which INS agents procured waivers of the right to a hearing in document fraud proceedings were

---

1. The three remaining claims are: (1) the plaintiffs' assertion that they are entitled to translations of the fine notice and the rights/waiver notice in languages other than Spanish and to oral translations of the forms into all other languages; (2) the plaintiffs' assertion that the INS was required to serve the fine notice forms on plaintiffs' attorneys and that the INS is prohibited from obtaining waivers without letting aliens consult with counsel; and (3) the plaintiffs' assertion that INS agents coerced at least some of the plaintiffs into waiving their rights to a hearing on the document fraud charges.

2. A waiver of either of these basic rights is valid only if the government demonstrates that the alien intentionally relinquished a known right or privilege. *See United States v. Lopez–Vasquez*, 1 F.3d 751, 754 (9th Cir.1993); *see also Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir.1991) (stating that "[c]onstitutional rights may ordinarily be waived [only] if it can be established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent").

constitutionally deficient because the forms used in connection with these proceedings did not adequately inform aliens of their right to a hearing or of the drastic immigration consequences that would ensue if the alien failed to request a hearing. As a result, the aliens' waivers were not made knowingly and voluntarily. These procedures, the plaintiffs contend, have been employed nationwide by the INS in virtually every case in which the government has charged an alien with committing document fraud.

## I. The Forms

An alien who is alleged to have committed civil document fraud in violation of § 274C learns of the charges against him by means of several INS forms that are served upon him. Two forms—the fine notice and the rights/waiver notice—are served simultaneously. Because aliens who commit civil document fraud are subject to immediate deportation, they also receive another form, an Order to Show Cause ("OSC") regarding deportation. The OSC is frequently served at the same time as the initial two forms.

The fine notice, which is written in English, informs the alien of the specific charge against him and states that he will be fined and ordered to cease and desist from the prohibited activity as a consequence of the charge. This form also notifies the alien that he may request a hearing to contest the charge. With respect to the hearing, the fine notice states:

> If a written request for a hearing is not timely filed, the Service will issue a final and unappealable order directing you to pay a fine in the amount specified in this Notice and to cease and desist from such violation(s).

Notwithstanding the notice's statement that the failure to file a request for a hearing will result in a final order imposing a fine and a cease and desist requirement, the notice does not explain or even mention the severe immigration consequences that will ordinarily result if the alien fails to request a hearing— specifically, the high probability that the alien will be deported immediately. Nor does it advise the alien that document fraud constitutes a deportable offense and that he will not be able to contest the charge at his deportation hearing.

The rights/waiver notice is a very dense form. It is divided roughly into thirds. In the top third, it lists the various rights to which the alien is entitled in the context of document fraud proceedings, such as the right to be represented by an attorney and the right to file a written request for a hearing. Buried in the middle third of the form, just above a line on which the INS official signs his name to indicate personal service, is a statement that an alien who is subject to a final order under § 274C "will be excludable pursuant to Section (a)(6)(F) of the Act and deportable pursuant to Section 241(a)(3)(C) of the Act." In the bottom third of the notice, the INS provides a section in which the alien may waive his right to a hearing and admit that he engaged in document fraud. The acknowledgement reads:

> I acknowledge that I have (read) (had interpreted and explained to me in the _____ language) and understand the contents of this document, a copy of which I have received. I further understand that I waive the right to request a hearing before an administrative law judge and agree to pay the penalty amount, as specified in the Final Order. I understand that this waiver shall result in the entry of a Final Order for a violation of Section 274C of the Act, from which there is no appeal.

The acknowledgement does not state that the alien understands that by waiving his right to a hearing as to the document fraud charges he also waives his right to challenge his deportability and excludability on that account, and he will in most instances be permanently barred from re-entering the country. The acknowledgement only asks the alien to acknowledge that he is agreeing to pay a fine and that an order will be issued "for a violation of Section 274C of the Act." It does *not* ask him to acknowledge that he is consenting to his deportation and that the deportation hearing he will receive will in most instances be rendered meaningless. Further, neither the fine notice nor the rights/waiver notice provides a form the alien can use to request a hearing on the charges of document fraud.

In addition to these two forms, aliens charged with civil document fraud are also served with an OSC regarding deportation. As noted above, the OSC is frequently served simultaneously with the fine notice and the rights/waiver notice. The OSC is five pages long, and, unlike the fine notice and the rights/waiver notice, which are written in English only, the OSC is written in both English and Spanish. Often, a warrant authorizing the arrest of the alien, also translated into Spanish, is attached to the OSC.

The first page of the OSC notifies the recipient that deportation proceedings are pending against him and informs him of the specific allegations with respect to his deportability. Sometimes the allegations refer to the document fraud, which is the subject of the accompanying documents. Sometimes they charge only illegal entry or some similar offense. OSCs in the second category may then be amended to charge the document fraud directly. The second page explains the purpose of the notice as follows:

> This notice identifies your rights as an alien in deportation proceedings, and your obligations and the conditions with which you must comply in order to protect your eligibility to be considered for certain benefits.

It further explains that *a hearing will be scheduled* "no sooner than 14 days from the date [the alien] was served with [the OSC]" and that *at this hearing,* the alien "will be given the opportunity to admit or deny any or all of the allegations in this Order to Show Cause, and whether [he is] deportable on the charges set forth [in the order]." It does not, however, advise an alien who has been charged in the OSC with document fraud that unless he requests a *separate* hearing on those charges, he will *not* be able to contest them at the deportation hearing, and that he will *not* be able to contest his deportability or excludability at any time thereafter. Nor does it tell him that in order to obtain the separate hearing on the document fraud charges, he must file a separate written request, unlike in the case of the deportation hearing, which, he is told, he will receive automatically. It also does not advise those aliens who are charged with offenses other than document fraud that the document fraud charges, which were contained in the other forms that were simultaneously served on him, or were served on him during the same general time period, cannot be contested at the deportation hearing. Finally, it does not provide the alien with any form that will enable him to request the separate hearing that is required on the document fraud charges.

On the third page, the OSC identifies the specific provision of the INA under which he is subject to deportation and explains that the INS will mail under separate cover a notice regarding the date of the deportation hearing. The fourth page describes in detail the sequence of events that will follow if the alien fails to appear at the deportation hearing. The fifth and final page contains a Certificate of Translation and Oral Notice, in which the alien may verify that the OSC was read to him in Spanish.

In sum, an alien charged with civil document fraud receives three forms advising him of two hearings. One hearing, he is told— the hearing on the document fraud charges, the consequence for which is stated to be a fine and a cease and desist order—will be held only if the alien submits a written request. The other hearing, the alien is advised—the hearing on the far graver issue whether he will be deported—will be held automatically, without the need for him to do anything. He is also told that at *that* hearing he will be able to respond to the allegations that constitute the basis for the threatened deportation. None of the forms advises the alien that if he fails to request a *separate* hearing on the document fraud charges, the deportation hearing he receives will ordinarily be meaningless, that he will be found deportable and excludable on the ground of document fraud without any further opportunity to challenge that determination, and that his deportation will in most instances be virtually automatic.

## II. Summary Judgment

As a threshold matter, we must determine whether the district court's grant of summary judgment was proper. In reviewing that decision, we view the evidence presented

in the light most favorable to the nonmoving party. We look first at the facts upon which the district court relied and examine the government's contention that material facts were in dispute. We then consider the government's argument that the district court's legal analysis is flawed.

## A. The Facts

### 1.

The district court concluded that the plaintiffs were entitled to summary judgment because the INS procedures for securing waivers of a hearing on document fraud charges create an unacceptable risk of confusion likely to result in erroneous deportation. Specifically, the district court found that the following factors caused many aliens to misapprehend the consequences of the failure to seek a hearing on the document fraud charges.

First, the district court found that because the forms are written in complex and legalistic language, they "fail to indicate in clear, simple terms that a document fraud final order leads to immediate deportation with almost no chance of readmission." In reaching its conclusion that the members of the plaintiff class were unable to understand the import of the fine notice and rights/waiver notice forms, the district court relied on statistical evidence to show that noncitizens generally do not understand that when they sign the rights/waiver form, they are waiving their right to contest the document fraud charges. Additionally, the district court relied on specific testimony by class members who testified that when they signed the waivers, they did not fully understand that they were relinquishing their right to be heard on the document fraud charges; rather, they believed that they could still contest the document fraud charges at their deportation hearing.

Further, the district court found that class members who signed waivers did not understand the severe immigration consequences attendant on the document fraud charges. Specifically, they did not understand that by relinquishing their right to a hearing as to the document fraud charges, they were effectively relinquishing their right to contest their deportability or excludability. In its order granting summary judgment, the district court stated that "[m]ost, if not all, of the aliens who testified stated that they did not understand the forms, and did not realize that they faced permanent exclusion." Indeed, the district court observed that the forms are so obscure and confusing with respect to this point that even some of the INS agents who administer them are unable to explain adequately the immigration consequences of a final order on document fraud charges. According to the district court, the agents' ignorance not only demonstrates that the forms themselves are inadequate, but also shows that the agents are incapable of remedying the insufficiency of the forms by providing an explanation to the aliens.

Next, the district court noted that the impenetrable and confusing nature of the forms was heightened in the specific context in which they were used. Given that most recipients of the forms are noncitizen immigrants whose primary language is one other than English, the court concluded there is very little chance that they, in particular, would be able to plow through the legalistic language in order to figure out what steps to take so as to contest their deportation.

Additionally, the district court determined that the English-only waiver forms, which explain the document fraud hearings, are frequently presented at the same time as the OSCs regarding deportation. Unlike the fine notice and the rights/waiver notice, which are presented in English only, the OSCs are presented in English with a Spanish translation after each line or with a Spanish translation set forth in parallel columns. The simultaneous presentation of these forms is significant because they all refer to integrally related matters. The district court concluded that because the OSCs are written in both English and Spanish but the fine notice and rights/waiver notice forms are not, an alien who receives all of the forms is likely to believe that the OSC is of greater importance than the other two.

Finally, Judge Coughenour concluded that the language of the OSC is likely to give the alien the impression that in order to chal-

lenge the document fraud charge he need only appear at the deportation hearing. In other words, the OSC would lead an alien to believe that it is not necessary to take any action with respect to document fraud in order to obtain a deportation hearing at which he can effectively oppose a finding of deportability and excludability. This impression is, the district court concluded, contrary to the actual facts. As Judge Coughenour pointed out, the document fraud charge can *only* be contested at a separate document fraud hearing, and the alien must file a written request in order to obtain such a hearing; if the alien fails to make a request for *that* hearing, a final, unappealable order is entered, thereby rendering him immediately deportable, and by the time the deportation hearing rolls around the question of the alien's deportability and excludability has been resolved against him.[3]

### 2.

The government argues that the district court ignored conflicting factual evidence in determining that the INS forms and procedures violated due process, and that summary judgment was therefore inappropriate. In support of its contention that the district court improperly granted summary judgment, the government identifies several disputed issues of fact, and argues that the district court ignored these factual disputes in finding that the forms do not provide adequate notice. Although we agree with the government that some factual issues are in dispute, we do not find that any of these issues is material to the plaintiffs' due process claims. Significantly, the government does not challenge any of the facts upon which the district court relied in concluding that the document fraud forms and procedures do not provide adequate notice. Be-

cause they played no role in the district court's constitutional analysis, the factual issues identified by the government are not material.

For example, the government points out that a factual dispute exists regarding the language abilities of the class members. The government contends that, while the district court stated that it is "uncontestable that most respondents speak primarily or only Spanish," evidence in the record demonstrates that in fact, "[m]any 274C respondents speak English well, have a working knowledge of English, or worked and lived in the United States a significant length of time." In making this argument, the government apparently wants us to attribute to the district court a categorical conclusion that the members of the plaintiff class do not speak any English. However, we do not read the district court's statement to mean anything more than what it says. That some class members may be able to communicate to a certain extent in English does not contradict the point upon which the district court relied—those who are charged with document fraud are, for the most part, aliens whose primary language is not English. Moreover, we conclude that the documents are so bureaucratic and cumbersome and in some respects so uninformative and in others so misleading that even those aliens with a reasonable command of the English language would not receive adequate notice from them.

We have likewise considered the remaining issues of fact identified by the government as being in dispute and conclude that none of them is of any consequence to the determination that the forms are constitutionally inadequate. We emphasize that summary judgment may be proper even in light of existing factual disputes, as long as none of the facts in dispute is material. Giv-

---

3. As the district court pointed out, under limited circumstances the Attorney General has the discretion to waive deportation for certain aliens who have received final orders on document fraud charges. The record reveals that such discretion has rarely been exercised. The district court also took into consideration the new exception provided in § 345 of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996). That section provides

that the Attorney General may grant a discretionary waiver to aliens who have not previously been fined under § 274C and who committed the offense "solely to assist, aid, or support the alien's spouse or child (and no other individual)." 8 U.S.C. § 1227(a)(3)(C)(ii). Judge Coughenour still concluded that the issuance of any final order of document fraud virtually ensures automatic deportation. We would only add that it is not necessary to go that far to reach the result the district court correctly reached here.

en the essential facts that determine the outcome in this case—the complexity and ineptness of the forms and the fact that they are designed to provide essential information of constitutional significance to persons of foreign birth—we conclude that the district court properly found that no issues of material fact precluded summary judgment.

### B. Due Process Analysis

■ According to the government, the district court's legal conclusions regarding the constitutionality of the INS forms are erroneous, and it advances the following arguments in support of this position: (1) the contents of the forms adequately apprise the alien of his rights and the direct consequences of waiving those rights, and due process does not require that forms, such as the waiver of rights form, be in any language other than English; (2) in applying *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the district court erred in calculating the various interests at stake and, as a consequence, misapplied the balancing test; and (3) even if there was a constitutional violation, the plaintiffs failed to demonstrate that any prejudice flowed therefrom.

### 1. Contents/Language of the Forms

Initially, the government contests the district court's decision that the forms fail adequately to inform aliens of their rights and of the consequences of waiving them. Our review of the forms leads us to conclude that the district court properly evaluated them in light of all the relevant circumstances and correctly determined "that a *confluence of factors*" rendered them constitutionally inadequate. Whether or not any one of the factors alone might be insufficient to create a

due process violation, the combination of factors—the forms' failure to advise the alien in clear terms of the need to request a separate hearing on the document fraud charges in order to contest deportability on that ground; the forms' failure to explain the drastic immigration consequences that ensue from a final order on the document fraud charges; the fact that the fine notice informs the alien that the penalty for document fraud is simply the imposition of a fine and the issuance of a cease and desist order; the fact that the acknowledgement in the rights/waiver form does not state that a failure to request a hearing will result in a finding of deportability and permanent excludability, and in most instances immediate deportation (although the acknowledgement purports to set forth the consequences of that failure); the legalistic language and confusing references to sections of the INA; the practice of presenting the monolingual fine notice and rights/waiver notice forms simultaneously with the bilingual OSC;[4] the failure to provide translations or explanations of the forms (other than the OSC) to aliens who have difficulty comprehending English; and the statements in the OSC assuring the alien that he will receive a deportation hearing at which he may refute the charges that will serve as the basis for deportation—produces a high likelihood that aliens receiving the forms will be confused and misled.

We reject the government's argument that the document fraud forms satisfy the notice component of due process even if they do not apprise the alien of the drastic consequences regarding deportation.[5] Informing an alien that a final order under § 274C will result in a finding of deportability and permanent ex-

---

4. We duly note the government's contention that due process does not require the government to provide notice in any language other than English. *See infra* Part II. Because the government elected to provide some information in a language other than English, however, it created the possibility that the partial use of bilingual forms would result in greater confusion than if it had used monolingual forms exclusively. We express no view regarding whether due process ordinarily requires that the type of forms used here be translated into Spanish or any other language. The district court properly dismissed that claim without prejudice.

5. In its brief, the government maintains that deportation is merely a collateral consequence of an adverse finding in a § 274C proceeding. This contention is without merit—the statute specifically provides that "[a]n alien who is subject to a final order [on document fraud charges] is deportable." 8 U.S.C. § 1251(a)(3)(C)(i). The fact that there may be limited discretionary relief from this otherwise inexorable result does not transform it into a mere collateral consequence.

cludability, and in most instances immediate deportation, is necessary in order to ensure that the alien understands that he *must* request a *separate* hearing on the document fraud charges in order to preserve his rights. Otherwise, the alien has no reason to know that by waiving his opportunity for a document fraud hearing, he is waiving his right to a meaningful deportation hearing. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ("The notice must be of such a nature as reasonably to convey the required information."). Here, the alien never learns *how* to take advantage of the deportation procedures because the combined effect of all the forms together is confusion. *See also Perkins v. City of West Covina,* 113 F.3d 1004, 1012 (9th Cir.1997) (explaining what kind of notice is constitutionally sufficient).

In fact, the forms the government serves on the plaintiffs are not only confusing, they are affirmatively misleading. The fine notice specifically advises the alien that a final order on the document fraud charges will direct him to pay a fine and to cease and desist from his wrongful conduct. It says nothing about the fact that a final order will result in a finding of deportability and excludability, or the likelihood that it will result in the alien's immediate deportation. The acknowledgement in the rights/waiver form exacerbates the problem by once again listing the penalties for the offense but failing to mention the drastic immigration consequences. Moreover, the OSC, which is frequently served on the alien simultaneously with the other two document fraud forms compounds the due process violation. Understandably, the OSC, which is the only form that is bilingual, is the most worrisome to the alien because it threatens deportation. As a consequence, many aliens are likely to pay more attention to the OSC than to any other form. Although the OSC specifically promises the alien an opportunity to be heard as to whether or not he should be deported, in document fraud cases such a promise is frequently illusory; for in the meantime, the alien will often have unknowingly waived his only opportunity for a hearing on charges that will render him both deportable and excludable. Yet nowhere does the OSC even hint at the need for the alien to request a separate hearing. To the contrary, it expressly informs him that a hearing at which he can contest the charges on which deportation is threatened will be scheduled automatically. By making that assurance, the government lulls the alien into a false sense of procedural security, whether or not document fraud ultimately serves as the basis for the deportation order; for, at the very least, the alien will without further recourse be held to be deportable and permanently excludable.

### 2. Mathews v. Eldridge

■ The government maintains that the district court erred in evaluating the relevant interests under the calculus established in *Mathews v. Eldridge.* As the *Mathews* balancing test makes clear, whether a particular procedure is sufficient to satisfy due process depends on the circumstances. Thus,

> [i]n evaluating the procedures in any case, the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures.

*Id.* at 34, 96 S.Ct. 893 (citing *Mathews,* 424 U.S. at 319, 96 S.Ct. 893). We agree with the district court that the relevant factors weigh in favor of altering the document fraud forms.

It is clear that the plaintiffs' interests in this case are significant. *See Plasencia,* 459 U.S. at 34, 103 S.Ct. 321 (noting that the alien's interest in deportation proceedings "is, without question, a weighty one" because "[s]he stands to lose the right 'to stay and live and work in this land of freedom.'") (quoting *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945)). The government's interests in the administration of its immigration laws and in preventing document fraud are likewise considerable. *Id.* Striking the proper balance between these interests can be achieved by adopting procedures that reduce the risk of erroneous

deprivation without imposing an undue burden on the government.

Requiring the government to alter slightly its procedures in document fraud proceedings will achieve the desired effect—additional safeguards—without visiting upon it any inordinate hardship. Specifically, it is possible to reduce the risk of erroneous deprivation (*i.e.*, erroneous deportation) by ensuring that aliens facing charges of document fraud are adequately notified that they *must* request a separate hearing to contest those charges and that their failure to do so will ordinarily foreclose their ability to challenge their status as deportable aliens.[6] Providing constitutionally adequate notice requires only minor changes in the content of the forms themselves and equally slight adaptations in the INS's method of presenting the forms. Requiring the INS to ensure that there are no significant inconsistencies in the written language of forms that affect whether or not an alien will be rendered deportable and permanently excludable, and requiring minor modifications to the written content of the forms will not be unduly burdensome, particularly in light of the benefits of such safeguards.

### 3. Prejudice

■ The government additionally challenges the district court's finding that certain members of the plaintiff class suffered prejudice as a result of the constitutionally deficient proceedings.[7] We question whether the plaintiffs in this case must demonstrate

---

6. The government maintains that in calculating the burden on the government of additional safeguards, the court should consider the costs of making the new requirements retroactive. In taking this position, the government has confused two distinct analyses. The question whether a certain procedure violates an alien's right to due process is separate from the question regarding the proper remedy once a due process violation has already been found.

7. In some respects, the prejudice issue overlaps with the question whether the plaintiffs suffered actual injury to justify injunctive relief. To the extent the issues are the same, we address some of the government's contentions regarding the actual injury inquiry in our discussion of the prejudice requirement.

---

prejudice in order to prevail on their due process claims.[8] However, because both parties assume that they must do so, we do not consider the question here. Instead, we assume *arguendo* that prejudice is required and conclude that the district court properly found that the plaintiffs made the required showing.

■ When it is necessary to demonstrate prejudice as a result of a constitutional violation, the alien must show that the inadequate procedures occurred "in a manner so as potentially to affect the outcome of the proceedings." *Hartooni v. INS*, 21 F.3d 336, 340 (9th Cir.1994); *see also United States v. Jimenez–Marmolejo*, 104 F.3d 1083, 1086 (9th Cir.1996) (holding that in order to show prejudice, an alien need not prove that he would not have been deported, just that he had "plausible grounds for relief"). Ordinarily, there must be plausible scenarios in which the outcome of the proceedings would have been different, absent the constitutional violation. *See United States v. Leon–Leon*, 35 F.3d 1428, 1430 (9th Cir.1994).

Here, the district court determined that at least two class plaintiffs had demonstrated that the lack of adequate notice as to their document fraud proceedings potentially affected the outcome of their document fraud proceedings. In the cases of Ninfa Guerrero de Adames and Antonio Santana–Alvarez, the district court found that each had a viable legal defense to the charges that had been brought against them. With respect to Adames, the district court found that she

---

8. Neither party cites to a case in which an alien who received constitutionally inadequate notice and was therefore deprived of a hearing was required to demonstrate prejudice in order to obtain relief. Instead, each of the cases to which they cite involved alleged due process violations that occurred *during the alien's hearing*. See, e.g., *United States v. Alvarado–Delgado*, 98 F.3d 492, 493–94 (9th Cir.1996); *Hartooni v. INS*, 21 F.3d 336 (9th Cir.1994). In *United States v. Proa–Tovar*, 975 F.2d 592 (9th Cir.1992) (en banc), we specifically recognized that "there may well be times when the administrative proceedings were so flawed that effective judicial review will be foreclosed." *Id.* at 595. Here, the plaintiffs did not receive *any* hearing, even a procedurally defective one. Consequently, no evidentiary record has been developed for a court to review.

could have made a persuasive argument that the document fraud charges, as applied to her, violated the prohibition against ex post facto laws. In Santana–Alvarez's case, the district court found that he had a strong legal argument that his conduct did not constitute a violation of the document fraud laws. There is no evidence to suggest that these findings are erroneous.[9] The district court determined that if Adames and Santana–Alvarez had not waived their right to a hearing, they might have been able to defend against the charges successfully. Accordingly, the district court concluded that the lack of notice regarding the right to a hearing potentially affected the outcome of the proceedings.

We agree with the district court that Adames and Santana–Alvarez are not precluded from showing prejudice simply because they admitted, while testifying under grants of immunity, that they had used fraudulent immigration documents. It is sufficient for purposes of showing prejudice that the plaintiffs have demonstrated *plausible* grounds for relief. The potential legal defenses identified by the district court satisfy this standard.

### III. Class Certification

Rule 23(a) provides that a court should certify a class only if the following prerequisites are met: (1) the class is too numerous, making joinder of the parties impracticable; (2) common questions of law or fact exist among the class members; (3) the claims of the class representatives are typical of the claims of the class; and (4) the class representatives will adequately represent the interest of the class. In addition to satisfying the mandatory prerequisites in Rule 23(a), the potential class members must also demonstrate that they meet at least one of the alternative requirements under Rule 23(b). In this case, the government disputes the existence of two of these requirements—commonality and adequacy of representation. Additionally, the government challenges the

district court's certification of the class under Rule 23(b)(2).

### A. Commonality

Requiring there to be common questions of law or fact prior to certifying a class serves chiefly two purposes: (1) ensuring that absentee members are fairly and adequately represented; and (2) ensuring practical and efficient case management. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In this case, each class member raises the same constitutional question: whether the nationwide procedures used by INS in document fraud proceedings sufficiently apprise aliens of their constitutional right to a hearing, thereby satisfying the notice component of due process.

The government maintains that the commonality requirement is lacking because the actual experiences of the class members are not sufficiently similar. Some individual INS agents and branch offices, for example, have consistently disregarded the Agency's official policy regarding the use of forms in § 274C proceedings and have instituted supplemental explanations of the potential immigration consequences. Therefore, some aliens who were subject to document fraud charges may have received adequate notice in spite of the constitutionally deficient official procedures.

To support its contention that the class members' claims lack commonality, the government points to terms of the injunction that provide for individualized proceedings. Specifically, it relies on the portions of the injunction providing the government with the opportunity to demonstrate that an individual class member "received constitutionally adequate notice despite having received the section 274C notice forms that the Court has found defective." According to the government, these proceedings demonstrate that there is no common factual or legal basis for the class claims; if commonality existed,

9. With respect to Santana–Alvarez, the government attempts to undermine the district court's finding by arguing that the scenario urged by Santana–Alvarez is speculative, as well as by posing alternative scenarios in which he would

have been convicted of document fraud. Demonstrating that possible outcomes exist other than the outcome proffered by Santana–Alvarez does not, however, refute the district court's finding of prejudice.

there would be no need for such individualized procedures.

We think the government misses the point. There is nothing wrong with the district court's presumption that the INS actually employed its constitutionally deficient policies and procedures. The government made no showing in the district court that its procedures were modified by more than just a few agents and branch offices. Thus, it is reasonable to presume that class members involved in document fraud proceedings did not receive due process because of the inadequate forms. Moreover, as the district court observed, it would be "a twisted result" to permit an administrative agency to avoid nationwide litigation that challenges the constitutionality of its general practices simply by pointing to minor variations in procedure among branch offices and individual INS agents, particularly because the variations were designed to avoid the precise constitutional inadequacies identified by the plaintiffs in this action.

The government further argues that commonality is nonexistent on account of factual distinctions in the class members' underlying claims. Differences among the class members with respect to the merits of their actual document fraud cases, however, are simply insufficient to defeat the propriety of class certification. What makes the plaintiffs' claims suitable for a class action is the common allegation that the INS's procedures provide insufficient notice. *See Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993) (noting that the need for subsequent individual proceedings, even complex ones, "does not supply a basis for concluding that [the named plaintiff] has not met the commonality requirement").

## B. Adequacy of Representation

Requiring the claims of the class representatives to be adequately representative of the class as a whole ensures that the interests of absent class members are adequately protected. *Hansberry v. Lee*, 311 U.S. 32, 42, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Whether the class representatives satisfy the adequacy requirement depends on "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir.1994) (quoting *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir.1992)). Here, the district court specifically found that the attorneys for the class representatives were well qualified and that the class representatives themselves were adequate because they were not antagonistic to the interests of the class and were "interested and involved in obtaining relief."

In challenging the adequacy of the class representatives, the government primarily relies on the fact that some of the named plaintiffs have admitted under grants of immunity that they committed document fraud. According to the government, these admissions preclude the possibility that these representative class members would have prevailed at a hearing on their document fraud charges, and because some of the class representatives cannot demonstrate prejudice—which, as we noted above, the parties assume to be a prerequisite to a finding of a due process violation—the class representatives are hindered in their ability to represent the class before the district court.

We find no merit in the government's position. Once again, the government erroneously emphasizes factual differences in the merits of the underlying document fraud charges. Such differences have no bearing on the class representatives' abilities to pursue the class claims vigorously and represent the interests of the absentee class members. Moreover, we note that the government's argument is particularly weak in light of the fact that the class representatives have been so successful in their efforts to obtain relief for the entire class.

## C. Rule 23(b)(2) Certification

Related to the commonality issue is the government's challenge to the district court's finding that the class was properly certified pursuant to Rule 23(b)(2). Certification under Rule 23(b)(2) is appropriate in cases in which

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2). Here, the district court found certification proper because the plaintiffs claimed that the INS's practices in document fraud proceedings were violative of due process. The forms and procedures in question were used by the INS in document fraud cases on a nationwide basis. Further, the plaintiffs sought injunctive, not monetary relief.

■ With respect to certification under Rule 23(b)(2), the government's primary objection appears to be that certifying this class does not further the purposes of Rule 23. Again, the government points to the individual proceedings that will result from the district court's injunction as evidence that judicial efficiency will actually be undermined by the class action. While the government correctly observes that numerous individual administrative proceedings may flow from the district court's decision, it fails to acknowledge that the district court's decision eliminates the need for individual litigation regarding the constitutionality of INS's official forms and procedures. Absent a class action decision, individual aliens across the country could file complaints against the INS in federal court, each of them raising precisely the same legal challenge to the constitutionality of the § 274C forms. Contrary to the government's assertion, therefore, class certification in this case is entirely proper in light of the general purposes of Rule 23, avoiding duplicative litigation.

■ We note that with respect to 23(b)(2) in particular, the government's dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding of the rule. Although common issues must pre-

dominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2). It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate. *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1775 (2d ed. 1986) ("All the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)."); *see also Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.1988) (emphasizing that although "the claims of individual class members may differ factually," certification under Rule 23(b)(2) is a proper vehicle for challenging "a common policy").

Moreover, the claims raised by the plaintiffs in this action are precisely the sorts of claims that Rule 23(b)(2) was designed to facilitate. As the Advisory Committee Notes explain, 23(b)(2) was adopted in order to permit the prosecution of civil rights actions.

### IV. The Injunction

■ According to the government, even if we uphold the district court's rulings with respect to the constitutional claims and class certification, we should nonetheless find that the district court erred in granting permanent injunctive relief. A district court's decision to grant a permanent injunction involves factual, legal, and discretionary components. Therefore, we evaluate a decision to grant such relief under several different standards of review. We review any legal conclusions de novo. *Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir.1986). A district court's factual findings are entitled to deference unless they are clearly erroneous. *Id.* Finally, we review the scope of injunctive relief for abuse of discretion.[10] *Id.*

---

10. While the government urges us to scrutinize the injunction in this case more closely than we ordinarily would, citing *Toussaint,* we see no reason to do so. The court in *Toussaint* adopted a somewhat novel standard of review because the nature of the relief, a structural injunction in the context of state prison conditions litigation,

called for more exacting review. *Id.* at 1087. We are not, however, reviewing a structural injunction in this case. Nor are we reviewing an injunction involving a state agency or official. *See Barnes v. Healy,* 980 F.2d 572, 576 (9th Cir.1992). Accordingly, we will apply the usual standards of review.

 Injunctive relief is appropriate in cases involving challenges to government policies that result in a pattern of constitutional violations. *See Allee v. Medrano*, 416 U.S. 802, 815, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (noting that a permanent injunction is proper when there is a persistent pattern of government misconduct); *see also Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir.1990) (upholding permanent injunctive relief "based on findings that the INS engaged in a persistent pattern of misconduct violating aliens' rights"). To qualify for injunctive relief, the class members must demonstrate that they will sustain irreparable injury and that remedies at law are inadequate. *Id.* In order to meet this standard,

> the plaintiffs must establish actual success on the merits, and that the balance of equities favors injunctive relief. That is, the plaintiff seeking an injunction must prove the plaintiff's own case and adduce the requisite proof, by a preponderance of the evidence, of the conditions and circumstances upon which the plaintiff bases the right to and necessity for injunctive relief.

*Id.* (citations omitted).

The government asserts that the class was not entitled to permanent injunctive relief because its members failed to show 1) actual success on the merits, 2) the inadequacy of legal remedies, irreparable injury, and 3) that the injunction was warranted by a balance of the equities. Additionally, the government maintains that the injunction, even if warranted under the law, was overly broad and exceeded the scope of the violation.

Because we have already determined that the district court properly decided that the INS forms used in document fraud proceedings were constitutionally deficient, we have necessarily resolved the question whether the plaintiffs have demonstrated actual success. We examine the government's remaining contentions in turn.

### A. Adequacy of Legal Remedies

 Injunctive relief is proper only if monetary damages or other legal remedies will not compensate the plaintiffs for their injuries. *LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir.1985). As to this issue, the government's only real complaint is that the district court failed to address the question whether legal remedies are adequate and the plaintiffs failed to present any evidence to demonstrate the need for injunctive, as opposed to legal, relief. However, we think it is evident that there are no legal remedies available that would adequately compensate the class members in this action. There is no way to calculate the value of such a constitutional deprivation or the damages that result from erroneous deportation. Accordingly, the class members in this case are entitled to equitable relief. *See American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1071 (9th Cir.1995).

### B. Irreparable Injury

 Next, the government challenges the district court's determination that the plaintiffs established that they would suffer irreparable injury as a consequence of the INS's constitutionally defective procedures. Specifically, the government contends that because the plaintiffs could not demonstrate prejudice, they were unable to establish actual injury. However, again assuming arguendo that prejudice is required, in light of our determination that the plaintiffs made a showing of prejudice in connection with the due process violation, we find this argument lacks merit.

Moreover, the class includes not only aliens who have already been deported without a hearing, but also aliens who may in the future be deported without a hearing. Thus, the irreparable injury analysis does not require precisely the same inquiry as the prejudice issue. To the extent that the injunction requires the INS to modify its forms and procedures, such equitable relief is warranted by the likelihood of erroneous deprivation in the future. *See Associated Gen'l Contractors of California, Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (the deprivation of a constitutional right alone may constitute irreparable injury).

### C. Scope

 Once a class has been certified and a constitutional violation has been ascer-

tained, the district court retains broad discretion in fashioning a remedy. *Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir.1990). We review the terms of the district court's injunction for abuse of discretion. *Securities & Exch. Comm'n v. Interlink Data Network*, 77 F.3d 1201, 1204 (9th Cir.1996). Here, the injunction serves a narrow purpose and is carefully tailored to achieve that goal. The order is designed to allow the members of the class to reopen their document fraud and deportation proceedings, thereby remedying the lack of adequate notice.

■ At the outset of its attack on the terms of the injunction, the government objects to the district court's issuing an injunction that provides classwide relief. Citing *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the government maintains that the systemwide relief mandated by the injunction is unwarranted because the plaintiffs only demonstrated that the constitutional violation prejudiced a few individuals. In *Lewis*, the Supreme Court reversed as overly broad an injunction that essentially called for an overhaul of law libraries in the Arizona prison system pursuant to *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Because there were only two instances in which prisoners were hindered from pursuing their legal claims due to the inadequacy of the prison law libraries, the Supreme Court held that systemwide relief was inappropriate.

In *Lewis*, the constitutional violation was not the violation of the right to adequate law libraries in prisons, but was instead the deprivation of the right of meaningful access to the courts. There was no showing that more than two prisoners suffered deprivation of that constitutional right and thus there was no showing of the need for systemwide relief. By contrast, the constitutional violation in this case is the inadequate notice itself. Thus, once the district court determined that the constitutionally insufficient forms and procedures were employed by the INS on a *systemwide* basis, the court had also determined systemwide injury. Every alien who received the fine notice and the rights/waiver notice forms suffered an injury because he did not receive the notice to which he was constitutionally entitled. Moreover, the lack of notice directly resulted in the failure of the class members to obtain constitutionally required hearings—a further constitutional injury.

To be sure, at least some aliens who faced document fraud charges were given adequate notice because a few INS offices employed different procedures; such aliens, however, are the exception rather than the rule. As we have already noted, it is uncontested that the constitutionally deficient forms were in widespread use across the country. Furthermore, there is no evidence to suggest that more than a handful of agents and one or two branch offices adopted procedures that attempted to remedy the inadequacy of the forms. Given the extent of the constitutional violation, the district court acted within its discretion in ordering systemwide relief. *Cf. Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir.1992) ("Specific findings of a persistent pattern of misconduct supported by a fully defined record can support broad injunctive relief.").

### D. Specific Terms

In addition to making a broadside challenge to the scope of the injunction, the government also objects to several of the order's specific terms. In particular, the government contends that the district court abused its discretion in (1) ordering an extensive publicity campaign; (2) requiring it to parole or make other arrangements for class members to contest their deportation; and (3) temporarily enjoining the deportation of class members. We consider separately the appropriateness of each provision that the government challenges, although we recognize that the individual elements are intended to work together in order to remedy the demonstrated constitutional violations.

#### 1. Publicity Campaign

■ In order to notify potential class members [11] of the judgment in their favor,

---

**11.** Class members are those "individuals who received section 274C final orders without a

the district court's injunction requires the INS to implement a thorough notice and publicity campaign. Specifically, the injunction calls on the INS to 1) send notice [12] to class members, if the INS is in possession of their last known addresses; 2) issue a newswire press release to news organizations in Central and South America; 3) distribute notice to the nonprofit organizations that regularly assist immigrants; 4) distribute notice to "appropriate international organizations and community outreach networks"; and 5) publish the notice in the Federal Register. Because the INS will have difficulty in effecting personal service on all class members, we think the district court's decision to order notice via press release is sound.

The government's principal objection to the publicity campaign is that the district court's order will have some absurd results. For example, the injunction requires the INS to send the English/Spanish notice to some international organizations that service immigrant populations that speak a language other than Spanish. We think this objection lacks merit. Given that Spanish is the primary language of many aliens who have been subject to final orders with respect to charges of document fraud, we think that this requirement increases the likelihood that class members will learn of the district court's ruling. Moreover, requiring bilingual notice imposes little, if any, additional burden on the government. Any adverse effect of such notice would be suffered by the non-English, non-Spanish speaking aliens who receive it, not by the government. In any event, we do not see how it does any harm to send a bilingual notice instead of a monolingual notice to a recipient who speaks neither language. Moreover, the government is free to send the notice in additional languages as well, where it deems such action to be appropriate.

### 2. Parole

 Permitting the class members to reopen their proceedings is necessary in order to provide a suitable remedy for the INS's failure to give adequate notice. However, allowing class members to reopen their proceedings is basically meaningless if they are unable to attend the hearings that they were earlier denied. Accordingly, the district court's injunction requires the INS to parole class members into the United States, or make other arrangements so that they may attend their hearings.[13] The government contends that the district court exceeded its authority in requiring the INS to grant parole to these individuals, as a matter both of recent statutory developments and of circuit precedent.

In determining that parole was a permissible component of an effective remedy in this case, the district court relied on language in 8 U.S.C. § 1182(d)(5). The government

hearing based on the notice forms that the [district court] found to be constitutionally deficient."

**12.** The district court also specified the form and content of the notice. Essentially, the notice, which is to be written in English and Spanish, must explain the details of the judgment and its consequences. In addition, the notice must provide a standardized form, which the recipient can sign and return to the INS to advise the agency that he wishes to have his document fraud proceedings reopened.

**13.** Multiple hearings may be warranted because under the terms of the injunction, the government has the opportunity to show that the alien in fact received adequate notice, notwithstanding the deficient forms. Assuming that the INS makes every available challenge, the likely progression of an alien's efforts to reopen his proceedings is as follows: first, the alien signs the form attached to the class notice, attesting that he received a final order under § 274C and that he did not request a hearing on the document fraud charges because he received inadequate notice; 2) the INS challenges the alien's claim of inadequate notice in front of an administrative law judge ("ALJ"); 3) if the ALJ agrees with the INS, the alien may appeal to the district court; 4) if the district court agrees with the ALJ, the § 274C final order will be upheld; 5) if either the ALJ or the district court finds that the alien received inadequate notice, the alien's § 274C proceedings will be reopened.

Once an alien's § 274C proceedings are reopened, the INS can recharge the alien using the new, court-approved forms, and the alien can request a hearing on the charges. If the INS opts not to recharge the alien, the final order will be vacated, and the INS will be required, in turn, to reopen the alien's deportation proceedings (assuming that the deportation order was in fact based on the document fraud order).

points out, however, that this particular provision of the INA has recently been amended by the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996). Whereas the law formerly permitted the Attorney General to parole an alien into the United States "for emergent reasons or for reasons deemed strictly in the public interest," it now permits her to do so "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). Under the new statute, argues the government, classwide parole is not available.

■ Assuming *arguendo* that the provisions governing the Attorney General's parole power impose limits on the federal courts' ability to remedy constitutional violations, an assumption we are not at all certain is correct, we do not agree that the change in the statutory language has any effect on the validity of the parole provision of the injunction. Although the district court's injunction pertains to the entire class, the parole provisions apply only to certain of those members who have already been deported; further, they are to be implemented by the Attorney General on an individual basis. Specifically, the injunction provides that the government must parole "an alien" who is entitled to reopen his document fraud proceedings; as we noted above, not all class members—not even all those who have been deported—will be entitled to reopen their proceedings. Rather, in order to be entitled to a hearing, an alien must first attest that he *in fact* received inadequate notice. Then, if and when a hearing is scheduled in his case, an alien who has been deported will be allowed on an individual basis to enter the country in order to attend his hearing. Thus, parole will be ordered by the Attorney General only on a case-by-case basis. Further, we note that parole for the purpose of remedying a constitutional violation clearly works a "significant public benefit."

In determining that granting parole was a necessary and permissible component of an effective remedy in this case, the district

court also relied on our decision in *Mendez v. INS*, 563 F.2d 956 (9th Cir.1977). In *Mendez*, we ordered the government to admit into the United States an alien who had been deported without first receiving due process of law. Parole was required in order to permit the alien "to pursue any administrative and judicial remedies to which he is lawfully entitled." *Mendez*, 563 F.2d at 959. In its effort to persuade us that *Mendez* does not support the district court's order in this case, the government seizes on an inconsequential distinction: "Mendez was not paroled to '*attend* reopened deportation proceedings' but to '*pursue* administrative and judicial remedies.'" This is simply a distinction without a difference. In both instances, the parole power is invoked in order to permit an alien to take advantage of procedures to which he is entitled.

We likewise disagree with the government's contention that the parole requirement is unduly burdensome. Without a provision requiring the government to admit individual class members into the United States so that they may attend the hearings to which they are entitled, the district court's injunction would be virtually meaningless. Finally, the district court's injunction does not *require* the government to parole individual class members into the country; instead it leaves the government with the option of establishing other procedures to achieve the same result.[14]

Because we find that requiring the INS to permit the plaintiffs to attend hearings at which their rights will be adjudicated does not violate IIRIRA and does not impose an undue burden on the government, we uphold the portion of the injunction that authorizes such relief.

### 3. Enjoining Deportation

■ Although the government does not contend that the district court lacked jurisdiction to hear the merits of the plaintiffs' claims, it nevertheless argues that the injunction's prohibition against the future deportation of aliens who received inadequate notice

---

**14.** Specifically, the injunction provides that "the INS must parole the alien or make other ar-

rangements to allow the alien to attend" a hearing.

is invalid under IIRIRA. With IIRIRA, Congress provided that

> [e]xcept as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C. § 1252(g). On the basis of this jurisdiction-limiting statute, the government contends that the district court did not have jurisdiction to order any relief that interferes with its attempt to execute deportation orders against the class members. We reject this contention.

As we noted above, the government does not assert that the district court was without jurisdiction to hear the claims brought by the plaintiffs, nor could it. By its terms, the statutory provision relied upon by the government does not prevent the district court from exercising jurisdiction over the plaintiffs' due process claims. Those claims do not arise from a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," but instead constitute "general collateral challenges to unconstitutional practices and policies used by the agency."[15] *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).

Further, this is not a case in which the plaintiffs have asserted a constitutional challenge in order to conceal the true nature of their claims. *See Catholic Soc. Servs., Inc. v. Reno*, 134 F.3d 921, 927 (9th Cir.1997). Their objective was not to obtain judicial review of the merits of their INS proceedings, but rather to enforce their constitutional rights to due process in the context of those proceedings. They have not raised a constitutional challenge to any of the substantive factors used by the government in determining whether to charge someone with document fraud, nor have they made any allegations as to the merits of the decision to execute removal orders against them, except to the extent necessary to substantiate their due process claims. Although the constitutional violations ultimately may have led to the plaintiffs' erroneous deportation, the resulting removal orders were simply a consequence of the violations, not the basis of the claims. Moreover, if the plaintiffs prevail on their claims, they will not be entitled to any substantive benefits; rather, they will only be entitled to reopen their proceedings. *See McNary*, 498 U.S. at 495, 111 S.Ct. 888.

 We are also mindful that "where possible, jurisdiction-limiting statutes should be interpreted to preserve the authority of the courts to consider constitutional claims." *American–Arab Anti–Discrimination Comm. v. Reno*, 119 F.3d 1367, 1372 (9th Cir.1997). And we reiterate that any legislation that completely immunizes an agency's practices and procedures from due process challenges "would raise difficult constitutional issues." *Catholic Soc. Servs.*, 134 F.3d at 927; *see also Califano v. Sanders*, 430 U.S. 99, 108, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (noting that "when constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by 'clear and convincing' evidence") (quoting *Weinberger v. Salfi*, 422 U.S. 749, 762, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)). In light of these concerns, we conclude that the statute does not impose a jurisdictional bar to the plaintiffs' claims or the relief the district court awarded.

---

15. In some significant respects, the jurisdictional issue we consider here is similar to jurisdictional issues that have arisen in the context of social security cases. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In those cases, the Supreme Court carefully drew a distinction between litigants who sought review of the agency's decision to award or deny benefits and litigants who raised colorable constitutional challenges to the procedures employed by the agency. *See Califano v. Sanders*, 430 U.S. 99, 108–09, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *see also Kicking Woman v. Hodel*, 878 F.2d 1203, 1206–07 (9th Cir.1989) (drawing the same distinction in the context of a decision by the Department of the Interior's Board of Indian Appeals).

Because the district court clearly had jurisdiction to hear the claims regarding constitutional violations in the context of the document fraud proceedings, it had jurisdiction to order adequate remedial measures, including injunctive provisions that ensure that the effects of the violation do not continue.

### 4. Other Provisions

In addition to these provisions, which the government challenges as unduly burdensome, the district court also ordered the INS to take the following measures: 1) the INS must cease using the forms that were found to be constitutionally inadequate; 2) the INS cannot use forms "that are not written in English and Spanish, or that do not simply and plainly communicate the nature and consequences of the section 274C charges and the procedures for contesting them"; and 3) if the INS serves a deportation-related OSC simultaneously with the § 274C forms, all the forms must "simply and plainly communicate in English and Spanish the importance and separate nature of the section 274C proceedings." The district court also established monitoring mechanisms in the injunction, such as a procedure that permits both the court and the plaintiffs to review the INS's modified forms.

 While we think that the district court's requirements regarding the content of the forms are generally well-founded, we are reluctant to insist that the relevant forms be prepared in both English and Spanish. We recognize that many of the recipients primarily speak a language other than English, and we agree with the district court that multilingual forms would be an effective means of ensuring adequate notice. However, we prefer not to impose such an obligation on the government. Instead, we think it more appropriate to leave it to the INS to determine in the first instance how best to revise its forms so as to "simply and plainly communicate" the necessary information and advice to the aliens against whom it brings charges. In doing so, the INS should bear in mind that among the flaws the district court properly identified in the agency's procedures was the furnishing to aliens of related documents that were inconsistent as to the language or languages in which they were written. That inconsistency contributed substantially to the finding of a due process violation.

### CONCLUSION

For the reasons stated above, we uphold the district court's grant of summary judgment and, with one minor exception, the terms of its injunction. We remand so that the district court may modify its order granting permanent injunctive relief in accordance with this opinion and may take whatever other action it may deem appropriate.

**AFFIRMED and REMANDED.**