Kurt John VON COLLN, Jr., Keith George Stringer, Eric Pratt, Jeffery Lloyd, Consolidated Plaintiffs,

v.

COUNTY OF VENTURA, Sheriff Larry Carpenter in his official and personal capacity, Sheriff Rob Brooks in his official and personal capacity, Chief Ken Kipp in his official and personal capacity, deputies John Hajducko, Dennis Smith, Clinton Johnson, Edwin Ilano and Todd Werre, and Does 1–10, Defendants.

No. CV–97–3896 LGB CWX.

United States District Court,
C.D. California,
Los Angeles Division.

Nov. 12, 1999.

Sonia M. Mercado, Sonia Mercado & Associates, R. Samuel Paz, R. Samuel Paz Law Offices, Los Angeles, CA, for Kurt John Von Colln, Jr., Keith George Stringer, Keith Pratt, Jeffery Lloyd, plaintiffs.

Alan E. Wisotsky, Alan E. Wisotsky Law Offices, Oxnard, for Ventura County of, Ventura County Sheriffs' Department, Larry Carpenter, Sheriff, Does 1 –10, Alan Hartkop, John Hajducko, John Hoelker, named as "Doe" Number 3, Brian Richmond, defendant named as "Doe" Number 4, Rob Brooks, Ken Kipp, Dennis Smith, Clinton Johnson, Edwin Ilano, Todd Werre, defendants.

ORDER (1) GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; (2) GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; (3) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (4) DENYING DEFENDANTS' MOTION TO DISMISS.

BAIRD, District Judge.

## I. INTRODUCTION

Plaintiffs in this case were detained by the Ventura County Sheriff's Department ("VCSD") at different times. During their detention, they were restrained in what has been called a "Pro-straint" chair. A Pro-straint chair is comprised of a plastic chair, leg irons, handcuffs, and various straps. Plaintiffs allege that the chair was used solely for the purpose of punishment, humiliation, and intimidation in violation of their constitutional rights.

## II. FACTUAL AND PROCEDURAL HISTORY

This case is brought by four individuals who were, at one point, detained by the VCSD, and on behalf of those similarly situated. Plaintiff Von Colln alleges that on May 28, 1996, he accidentally fell off his bicycle. *See* Consolidated Pls.' First Am. Compl. at 5. As a result of the fall, he became unconscious. *See id.* He was subsequently arrested and only regained consciousness upon arrival at the Ventura County Jail. *See id.* Von Colln alleges that he was in custody for approximately 24 hours, without ever being booked, or permitted to make a telephone call. *See id.* at 6. Furthermore, he alleges that when he asked what charges he was being detained for, he was stripped naked and sat down into a restraining chair. *See id.* at 5. Restraints were placed around his wrists and ankles. *See id.* Von Colln alleges that he was denied access to a bathroom, and as a result, while nude, defecated twice and urinated three times on himself. *See id.*

After defecating and urinating on himself, he was not permitted to get up and clean up. *See id.* Von Colln alleges that he was so detained for approximately five and one half hours. *See id.* at 6. When Von Colln pleaded to be released, the shackles to his ankles were further tightened, causing a fracture of his ankle. *See id.* Furthermore, Von Colln alleges that while still restrained in the chair, he was wheeled into a bathroom and made to clean up his own feces and urine with his bare hands, and then permitted to shower. *See id.* As a result of his broken ankle, Von Colln alleges that he could not walk, yet he was given no medical treatment. *See id.* As a result of these events, Von Colln alleges that he suffered severe injuries. *See id.* He also alleges that he is now on probation and lives in fear of being put back in the Pro-straint chair. *See id.*

Plaintiff Stringer was arrested on November 25, 1996. *See id.* at 7. He was taken into custody at his residence, and transported to the Ventura County Jail. *See id.* He alleges that he was non-violent at all times, and that he was never accused of any acts of violence against the officers. *See id.* Upon arriving at the county jail, he was first placed in a padded "safety cell." *See id.* About one hour later, Stringer alleges that he was taken into another cell. *See id.* Then, he claims that his clothes were taken off and he was placed in the Pro-straint chair, whereby restraints were placed on his wrists and arms, and leg irons were placed around his ankles and clamped down like handcuffs. *See id.* Stringer alleges that he was restrained as such for approximately four hours and was denied access to the bathroom or toilet facilities. *See id.* Stringer alleges that the shackles were tight, thereby causing pain and suffering. *See id.* When he complained of the pain, defendants ignored him and ridiculed him. *See id.* Stringer alleges that at no time did he show any signs of violence. *See id.* Furthermore, Stringer alleges that he was forced to urinate and defecate on himself and forced to sit in his own feces and urine. *See id.* This treatment, he alleges, caused him severe pain in his back and legs. *See id.* He also alleges that he is now on probation and lives in fear of being put back in the Pro-straint chair. *See id.* at 7–8.

Plaintiff Pratt was stopped and questioned by the Oxnard Police Department on July 27, 1997. *See id.* at 8. When he questioned the validity of the stop, he was arrested. *See id.* When he questioned the validity of the arrest, he was handcuffed, his feet were bound, and his handcuffed hands and bound feet were tied together. *See id.* Pratt was later taken to the Ventura County Jail. *See id.* He alleges that prior to his arrival at the County Jail, the arresting officers told the deputy sheriff that Pratt was "combative," although he alleges he was not. *See id.* He states that he was never charged with either resisting arrest or any crime of violence. *See id.* Pratt was then immediately tied to the Pro-straint chair in the same manner as described above. *See id.* However, a hood was also placed over his head. *See id.* He remained restrained for over seven hours during which the officers continuously refused to let him use the bathroom. *See id.* He states that while he was in the chair, he maintained a non-violent composure at all times, yet he was not released from the chair. *See id.* Furthermore, he alleges that a nurse asked on two occasions to have Pratt removed from the chair for his safety, but the deputies refused. *See id.* When he was released from the chair, he could not walk due to the pain and numbness to his ankles, legs, and back. *See id.* at 8–9. Defendants ignored him and refused to provide medical care, thereby causing him serious injuries. *See id.*

Plaintiff Lloyd was also in custody at the Ventura County Jail on August 19, 1997. *See id.* at 9. Lloyd alleges that he has a history of suffering from a mental disorder. *See id.* In the days before his arrest, Lloyd alleges that he went to the Santa Paula mental health facility to obtain his medication. *See id.* Unfortunately, however, he alleges that he was released with the wrong medication, thereby making him more depressed. *See id.* He alleges that the wrong medication made him suicidal. *See id.* As such, he allegedly attempted suicide by overdose of medication. *See* id. When his family called for assistance, they allegedly explained to the authorities that he was suicidal. *See id.* When the police arrived Lloyd claims that he

was "pepper sprayed." *See id.* He was then taken to the county jail, where he states that he too was placed in the Pro-straint chair. *See id.* Similarly, restraints were placed around his wrists and ankles. *See id.* Lloyd was refused access to the bathrooms, and therefore could not defecate or urinate for many hours. *See id.* He alleged that he was deprived of all decency and privacy, and endured inhumane pain, cramps and indignity while forced to withhold voiding of urine and feces. *See id.* He claims that he was never seen by a physician, even though the pepper spray allegedly caused exacerbation of his depressed and suicidal state. *See id.* Plaintiff Lloyd claims that when he was released from the chair, he could not walk due to excruciating pain and numbness to his ankles, legs, and back. *See id.* Furthermore, plaintiff alleges that the defendants either lost or failed to create a monitoring log or other record of who, if anyone, made the decision to place Lloyd in the chair for his suicidal state. *See id.* at 10. On May 21, 1998, Lloyd was again in custody at the county jail. *See id.* He alleges that at that time he verbally protested that his transfer to a medical facility was being delayed. *See id.* In response, the deputies allegedly threatened to place him in the chair. *See id.*

Plaintiff Lloyd is currently at the Metropolitan State Mental Hospital in Norwalk, and is awaiting trial, pending a determination of his mental ability to stand trial. *See* Defs.' Reply Mem. to Inj. and Class Certification Mot. Re. Newly Decided Ninth Circuit Decision at 6 ("Defs.' Supp. Mem.").

All four plaintiffs claim that these events give rise to three causes of action. First, they claim that the aforementioned events violated 42 U.S.C. § 1983 by depriving plaintiffs of their Constitutional rights, and particularly (1) the right to be free from infliction of cruel and unusual punishment; (2) the right not to be deprived of liberty without due process of law; (3) the right to be safe and protected from injuries while in defendants' custody; (4) the right to be protected by peace officers while in their control; (5) the right to be free from excessive and unreasonable force; and (6) the right to necessary medical treatment for plaintiffs' serious medical conditions. Second, plaintiffs claim that the afore-described events show that defendant Larry Carpenter (the former Ventura County Sheriff), Bob Brooks (the current Ventura County Sheriff), and Ken Kipp (the Chief of the Custody Division of the VCSD) failed to train deputy sheriffs, in violation of defendants' statutory duty, and that they failed to supervise and investigate deputy sheriffs thereby causing constitutional violations. Third, plaintiffs claim that the aforementioned events constitute a violation of 42 U.S.C. § 1983 by the defendants because the events constitute an unconstitutional custom or practice causing constitutional violations. Plaintiffs seek injunctive relief in order to prohibit the defendants from using the Pro-straint chair for purposes for which it was not designed. Plaintiffs also seek damages.

Plaintiff Von Colln filed his complaint on May 27, 1997. Plaintiff Stringer filed his complaint on November 13, 1997. Plaintiff Pratt filed his complaint on April 22, 1998. Finally, plaintiff Lloyd filed his complaint on July 28, 1998. On October 9, 1998, the Court approved a stipulation consolidating the first three cases. On March 11, *Lloyd v. County of Ventura* was transferred to this Court. On August 11, 1999, all four cases were consolidated.

On June 30, 1999, defendants filed four motions for summary judgment against all plaintiffs. The motions were originally scheduled to be heard on August 30, 1999. The Court received a consolidated opposition on August 2, 1999. On August 27, 1999, all four plaintiffs filed (1) a motion for class certification, and (2) a motion for preliminary injunction. Defendants filed their oppositions to both motions on September 13, 1999. These motions were originally scheduled to be heard on September 27, 1999. The Court vacated both hearing dates and advised the parties that it would reschedule for a later time.

On September 1, 1999, the parties stipulated and allowed the plaintiffs to file a "Consolidated Plaintiffs' First Amended Complaint" which deleted the VCSD as a named defendant, added some individual defendants, and named some of the existing defendants

in their personal capacity as well as their official capacities.

This new complaint prompted defendants to file an additional motion to dismiss the newly added defendants and to dismiss the individual defendants now named in their personal capacity. The motion was filed on September 29, 1999. The opposition was filed on October 1, 1999. The hearing for this motion was originally set for October 25, 1999.

On October 18, 1999, the Court vacated the October 25, 1999 hearing and rescheduled the hearing for all pending motions to November 1, 1999. At the hearing, defense counsel advised the Court that a recent Ninth Circuit decision clarified the standing issue in this case. Defense counsel provided the Court and plaintiffs' counsel with a copy of the opinion and a short brief. An additional hearing was set for November 4, 1999 to address the issues in the new case. This order addresses all pending motions.

## III. ANALYSIS

### A. STANDING

■ As a preliminary matter, defendants challenge each plaintiff's standing to seek injunctive relief. Standing is not merely a pleading requirement, but an indispensable part of the case, and must be established by evidence appropriate for every stage of the litigation. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The standard for determining whether plaintiffs have standing has three elements. First, the plaintiffs must have suffered an injury in fact. *See Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. Second, there must be a causal connection between the injury and the conduct complained of. *See id.* Third, it must be likely that a favorable decision will redress the injury. *See id.* Defendants here claim that plaintiffs do not have standing to obtain the injunction they seek.[1]

This inquiry must start with the seminal Supreme Court decision of *Los Angeles v.*

*Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In *Lyons*, plaintiff sued the Los Angeles Police Department ("LAPD") for civil rights violations, seeking both damages and injunctive relief. *See id.* Lyons had been the victim of a "chokehold" and sought both money damages and an injunction which would have prohibited the LAPD from using the chokehold on any other person. *See id.* In *Lyons*, the Supreme Court held that the plaintiff lacked standing to seek injunctive relief absent a sufficient likelihood that he will again be wronged in a similar way. *Lyons*, 461 U.S. at 109, 103 S.Ct. 1660. Because Lyons was not able to make this showing, the Court found that he lacked standing as to the injunction. *See id.* This opinion, on the surface, seems to decide the issue at hand. However, the Ninth Circuit has carved an exception to this rule. In *Giles v. Ackerman*, 746 F.2d 614, 619 (9th Cir.1984), the Court held that the plaintiff had standing to request injunctive and declaratory relief simply by virtue of her standing to bring her damage action. *See Giles*, 746 F.2d at 619. In *Nava v. Dublin*, 121 F.3d 453 (9th Cir.1997), the Ninth Circuit reaffirmed that holding. Specifically, it stated that "[a]fter *Giles*, in other words, plaintiffs in this Circuit were relieved of the obligation to allege a credible threat of future injury in order to seek forward looking relief so long as they also brought a claim for damages in the same action." *Nava v. Dublin*, 121 F.3d 453, 456 (9th Cir.1997). Cognizant of the breadth of this rule, the Ninth Circuit subsequently limited the exception to situations in which the claim for relief for damages and equitable relief are predicated on the same operative facts and legal theories. *See id.*

■ This principle is not without controversy. The Ninth Circuit is the only one to recognize such an exception. *See id.* at 457. As such, the *Nava* court applied the exception with reservation, and noted that several Ninth Circuit decisions impliedly declined to apply the rule. *See id.* at 457–58 (citing *O'Neal v. City of Seattle*, 66 F.3d 1064, 1066

---

1. Defendants only challenge plaintiffs' ability to show "injury in fact" and do not dispute that if plaintiffs do show such injury, there is a causal connection between the injury and the conduct complained of or that it is likely that a favorable decision will redress the injury.

(9th Cir.1995); *Thomas v. County of Los Angeles*, 978 F.2d 504, 507–08, 511 (9th Cir. 1992); *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1306–09 (9th Cir.1992); *Nelsen v. King County*, 895 F.2d 1248, 1249–55 (9th Cir.1990); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 528–29 (9th Cir.1989)).[2] Despite its reservations, however, the *Nava* Court held that a faithful interpretation of the Ninth Circuit cases creating the exception to *Lyons* required the court to apply that exception. *Id.* at 456. This Court must as well. Defendants do not challenge, nor can they, that plaintiffs do have standing to sue for the damages they suffered, nor could they argue that plaintiffs' claims for damages and for injunctive relief do not involve the same operative facts and legal theory. As such, plaintiffs have standing to sue for injunctive relief under *Nava.*

Even if this Court were to address this issue without the guidance of the *Giles* and *Nava* decisions, the Court finds that plaintiffs have shown a sufficient personal stake to warrant standing in this case. The evidence on the record shows that plaintiffs' allegations of future injury are not speculative. Although none of the four plaintiffs are currently incarcerated at the Ventura County Jail, defendant Lloyd is in custody at Metropolitan State Hospital awaiting return to Ventura County Jail for trial, and the other three named plaintiffs remain on probation. *See* Defs.' Supp. Mem. at 6. Furthermore, over the past three years, plaintiff Von Colln has been incarcerated twice in the Ventura County Jail, plaintiff Stringer has been incarcerated four times in the Ventura County Jail, and plaintiff Pratt was incarcerated eleven times at the Ventura County Jail. *See*

Maciel Decl. at 2–3. Finally, plaintiff Lloyd has "literally dozens and dozens of incarceration episodes in the Ventura County Jail system, and it would take several pages to list all the inclusive incarceration dates." *Id.* at 3. Therefore, considering the fact that all but one of the plaintiffs are on probation, combined with their apparent propensity to incarceration in the Ventura County Jail, it is beyond speculation that at least one of the named plaintiffs will be in custody of the Ventura County Jail in the near future.

Furthermore, it is also not speculative that the plaintiffs will be subject to unconstitutional treatment when they are returned to the Ventura County Jail. The defendants' conduct here is both recurrent and presumptively in violation of the plaintiffs' constitutional rights. The VCSD has a policy in place authorizing the use of the Pro-straint chair for arrestees. *See* Consolidated Pls.' Mot. Prelim. Inj., Ex. 3 ("Pls.' Ex. 3"). Furthermore, the data provided by the VCSD shows a pattern or practice of abuse of that chair. *See generally* Burns Decl. As such, "[t]he possibility or recurring injury ceases to be speculative when actual repeated incidents are documented." *Nicacio v. INS*, 797 F.2d 700, 702 (9th Cir.1985).

## B.  CLASS CERTIFICATION

■  Plaintiffs move for class certification under Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. Rule 23(a) provides that a district court may certify a class when,

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the

---

**2.**  The recent opinion of the Ninth Circuit, *B.C. v. Plumas Unified School District*, 192 F.3d 1260, 1999 Daily Journal D.A.R. 10807 is another one of these cases which "impliedly" refused to follow Ninth Circuit precedent set by *Giles* and *Nava*. The *B.C.* Court never addressed, or even attempted to distinguish, *Nava*. As such, there appears to be an intra-circuit split of authority on this issue. An intra-circuit conflict may be resolved authoritatively only through en banc proceedings. *See United States v. Sotelo–Murillo*, 887 F.2d 176, 179 (9th Cir.1989). Lacking such clear pronouncement from the Circuit, this Court must look elsewhere for guidance. The Eleventh Circuit, when faced with a similar dilemma, held

that when circuit authority is in conflict, a court should look to the line of authority containing the earliest case. *See Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1380 n. 10 (11th Cir.1997). That principle was recognized, and accepted, by a later panel of the Eleventh Circuit in *Walker v. Mortham*, 158 F.3d 1177, 1188 (11th Cir.1998). That court held that the "earliest case" rule is the correct one because (1) a decision of a prior panel cannot be overturned by a later panel, and (2) because of the importance of the prior precedent rule. *See id.* In this case, *Giles* was decided in 1984, and *Nava* was decided in 1997, all before *B.C.*, which was decided in 1999.

representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). In addition to satisfying the mandates of Rule 23(a), the proposed class members must also demonstrate that they meet one of the requirements of Rule 23(b). In this case, plaintiffs move under Rule 23(b)(2), which provides that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The party moving for certification bears the burden of demonstrating that it meets Rule 23's requirements. *See Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir.1977).

■ In deciding a motion for class certification, the district court exercises its discretion to determine whether or not to certify a class. *See id.* at 1309. When making this determination, a district court should bear in mind the two goals behind Rule 23: Class actions promote judicial economy because they minimize the multiplicity of identical suits, and they permit parties with small claims to assert them when they otherwise might not, because of litigation costs that outweigh any potential recovery. *See Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 349, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir.1991).

## 1. NUMEROSITY

Rule 23(a)(1) requires that "a class is so numerous that joinder of all members is impracticable." The Supreme Court, in *General Telephone Co. v. EEOC*, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), held that no specific threshold number for class certification exists, but instead, "[t]he numerosity requirement requires examination of the specific facts of each case." *Id.* at 330, 100 S.Ct.

1698. The "exact size of the class need not be known so long as 'general knowledge and common sense indicate that it is large.'" *Perez–Funez v. District Director*, 611 F.Supp. 990, 995 (C.D.Cal.1984) (quoting *Orantes–Hernandez v. Smith*, 541 F.Supp. 351, 370 (C.D.Cal.1982)).

According to the defendants, approximately 30,000 arrestees are booked annually at the Ventura County Jail. *See* Defendants' Opp'n to Pls.' Mot. for Class Certification at 24–25. Out of all those arrestees, plaintiffs have provided evidence that the chair was used approximately 377 times (312 times by defendants' account) over an 18 month period. *See* Burns Decl. in Supp. of Mot. Class Certification and Prelim. Inj. at 1.[3] Understandably, given that inmates are continuously brought in and out of the facility, the number fluctuates over time. All things being equal, however, the number of inmates subject to similar treatment in the next eighteen months will not be significantly different, and any figure in the three-hundred range certainly qualifies as a class in which joinder of all the members would be impractical. Furthermore, the purported class seeks to represent inmates who have been, are, and will be subject to confinement in the chair. Therefore, the Court finds that the plaintiffs meet this first factor.

## 2. COMMONALITY

Ensuring that a class is not over-inclusive, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The members of the class do not have to share every question of law or fact in common, but "issues ... common to the class as a whole" must exist and "turn on questions of law applicable in the same manner to each member of the class." *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Accordingly, the existence of individual issues remaining "after the common questions of the defendant's liability have been resolved

3. Katherine Burns conducted an analysis of approximately 4,000 pages of documents provided by the VCSD. These documents recorded the reasons, as documented by the deputies and nurses, arrestees were placed in the chair, and for how long they remained in the chair. *See*

Burns Decl. at 1. These documents were turned over by the Sheriff's Department as a result of a discovery order issued by Magistrate Judge Woehrle, and were intended to serve as a sampling for the purpose of this litigation. Defendants do not dispute the accuracy of the report.

does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). Therefore, commonality is met when the court is convinced that class members share enough issues that predominate over their claims that a class action is the most efficient method for adjudicating those claims. *See Califano*, 442 U.S. at 701, 99 S.Ct. 2545.

Nevertheless, courts have struggled to formulate a standard for determining when proposed class members share enough common issues to warrant certification. In two recent civil rights decisions, the Ninth Circuit recognized that when proposed members are moving for certification under Rule 23(a) in conjunction with Rule 23(b)(2), a district court may relax the commonality requirement. *See Hodgers–Durgin v. Vina*, 165 F.3d 667, 675–79 (9th Cir.1999); *Walters v. Reno*, 145 F.3d 1032, 1045–48 (9th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999). These decisions appear to follow the Third and Seventh Circuits' lead in liberalizing Rule 23(a)(2)'s commonality standard by stressing shared interests rather than differences among proposed class members that seek declaratory or injunctive relief. *See Hodgers–Durgin v. Vina*, 165 F.3d at 678–79 (citing *Baby Neal v. Casey*, 43 F.3d 48, 56–57 (3d Cir.1994); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 976 (7th Cir.1977)).

■ Under Rule 23(b)(2), commonality exists if plaintiffs share a common harm or violation of their rights, even if individualized facts supporting the alleged harm or violation diverge. Conversely, shared core facts support a commonality finding, even if plaintiffs assert disparate legal remedies. These holdings sit squarely with the Advisory Committee Notes to Rule 23, which state that Rule 23(b)(2) enables the prosecution of civil rights actions seeking declaratory or injunctive relief. *See* Fed.R.Civ.P. 23(b)(2) (Advisory Committee Notes); *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir.1998) (noting that Rule 23(b)(2) facilitates civil rights actions). In these types of cases, class members typically aim to invalidate a law or practice on constitutional or statutory grounds. The

central showing in these suits is that the class members share a general, common violation, rather than a unitary claim premised on identical facts or legal remedies. In short, when addressing commonality of class members proposed under Rule 23(b)(2), a court may employ a liberal definition of commonality.

The Court finds that plaintiffs' causes of action do involve common questions of law— i.e., whether the Ventura County practice of using the Pro-straint chair violates an arrestee's constitutional and statutory rights. Therefore, the Court finds that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a).

### 3. TYPICALITY.

■ Ensuring that a class is not under-inclusive, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). " 'The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so ... that the absentees' interests will be fairly represented' " *Hodgers–Durgin v. Vina*, 165 F.3d 667, 679 (9th Cir.1999) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir.1994)). Under this factor, a district court must inquire as to whether the named plaintiffs' individual circumstances markedly diverge or whether the legal theories and claims differ as to defeat the purposes of maintaining a class. *See id.* (quoting *Baby Neal*, 43 F.3d at 57–58). However, varying factual differences between the claims or defenses of the class and the class representatives will not necessarily render the named representatives' claim atypical. *See Smith v. B & O R.R.*, 473 F.Supp. 572, 581 (D.Md.1979). A finding of commonality frequently supports a finding of typicality. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (noting how the commonality and typicality requirements "merge").

Plaintiffs propose a class of past, current, and future detainees of the Ventura County Jail. These plaintiffs are challenging the county's use of the Pro-straint chair. They

are not asserting claims grounded in unique, idiosyncratic facts as to create an under-inclusive class. If it is found that the policies of the VCSD associated with the use of the chair are in violation of the inmates' constitutional or statutory rights, then that policy would be unconstitutional as to all Ventura County Jail detainees. Moreover, plaintiffs pray for injunctive relief that would affect every Ventura County detainee subject to the use of the Pro-straint chair. They do not request relief that requires the Court to make an inquiry into the facts surrounding each plaintiffs' claims. All these factors support the typicality showing.

Defendants do not squarely challenge that this requirement has not been met. They do assert that some of the named plaintiffs did not urinate or defecate on themselves, and that some of the factual circumstances of the named plaintiffs' placement in the chair were different. *See* Defs.' Opp'n to Pls.' Mot. Class Certification at 3–8. Defendants, however, miss the point. The issue here is whether the policy and practices associated with the use of the chair violate the arrestees' rights as guaranteed by the Constitution and statutes. Each plaintiff represented here has been subjected to such policy. As such, the element of typicality is met.

### 4. ADEQUACY OF REPRESENTATION.

■ Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In the Ninth Circuit, representation is "adequate" when counsel for the class is qualified and competent, the representatives' interests are not antagonistic to the interests of absent members, and the action is not collusive in nature. *See Dalkon Shield IUD Prod. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir.1982).

Defendants do not dispute this factor. As discussed above, the named plaintiffs and the class members raise identical claims, and no evidence exists to suggest that the representatives are antagonistic to other members of the class. Furthermore, plaintiffs' counsel specializes in civil rights and consumer rights litigation and has broad experience in suits challenging initiatives. *See* Paz Decl. at 1–2. Accordingly, the Court finds that plaintiffs have met this fourth factor.

### 5. RULE 23(b)(2).

In addition to Rule 23(a)'s requirements, plaintiffs must also satisfy one of the requirements outlined in Rule 23(b). *See* Fed. R.Civ.P. 23(b). Plaintiffs move for class certification under Rule 23(b)(2), which provides that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Advisory Committee Notes to Rule 23 recognize that subdivision (b)(2) enables the prosecution of civil rights claims. *See* Fed.R.Civ.P. 23(b)(2) (Advisory Committee Notes); *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (noting how Rule 23(b)(2) facilitates civil rights actions).

Defendants claim that the proposed class certification is improper because the plaintiffs are primarily seeking money damages. To support their argument, defendants claim that (1) the pursuit of injunctive relief is illusory; (2) plaintiffs lack standing; and (3) the plaintiffs cannot possibly be seeking injunctive relief because they are no longer in custody. The Court addresses these arguments *seriatim.*

#### a. Injunctive Relief is not Illusory

Disputes over whether the action primarily seeks injunctive relief rather than money damages neither promote the disposition of the case on the merits nor represent a useful expenditure of energy. *See* 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1775, at 470 (2d ed.1986). Therefore, they should be avoided. *See id.* If the Rule 23(a) prerequisites have been met and injunctive relief has been requested, the action should be allowed to proceed under subdivision (b)(2). *See id.* It is true that injunctive relief, in a Rule

23(b)(2) class, must be the primary goal of the cause of action. *See Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776, 780 (9th Cir.1986). Nonetheless, most of the reported cases dealing with this "predominance" issue have done so conclusorily and have not enunciated clear rules for applying the test. *See Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 451 (N.D.Cal.1994) (citing 1 H. Newberg, Class Actions § 4.14, at 4–49 (3d ed. 1992)). Nevertheless, the hallmark of a 23(b)(2) class action is homogeneity. *See Arnold,* 158 F.R.D. at 451. It is this characteristic that allows the court to dispense with the notice requirement and bind all members to a judgment on the merits without an opportunity to opt out. *See id.* For example, in class actions alleging employment discrimination, homogeneity is usually ensured because the defendant's allegedly discriminatory conduct affects the class as a whole, and makes final injunctive relief appropriate. *See Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 250, 253 (3d Cir.1975); *Arnold,* 158 F.R.D. at 451. This interpretation of the policy concerns underlying the restrictions on the sorts of suits that may be certified under Rule 23(b)(2) is supported by the fact that civil rights class actions are generally certified under the Rule. *See Arnold,* 158 F.R.D. at 452. In analyzing the claims at hand, it is clear that the claims of the class members are extremely homogeneous. Here, the class members all challenge the same behavior: the policy and practices associated with the use of the Pro-straint chair. The use of the chair affects all class members in almost precisely the same way because of common distinguishing characteristics: they are all arrestees in a particular county jail who are subject to the same unconstitutional treatment. This fact lends the proposed class an extraordinary level of homogeneity, far greater than most Title VII actions, which often allege that many separate actions against individuals manifest a common pattern and practice of discrimination. *See id.* In light of this high degree of homogeneity, it is clear that this suit is a paradigm of the type of action for which the (b)(2) form was created.

Furthermore, this principle of predominance has been applied in cases where plaintiffs sought to incorporate the damage portion of their claim into the Rule 23(b)(2) certification. It is not the case here. Plaintiffs only seek class status as to the injunctive relief claim. Furthermore, it is within the discretion of the trial judge to limit the issues in a class action to "those parts of a lawsuit which lend themselves to convenient use of the class action motif." *Society for Individual Rights, Inc. v. Hampton,* 528 F.2d 905, 906 (9th Cir.1975). As such, this Court finds that the class can be certified under Rule 23(b)(2) as to the injunctive remedy only.

**b. Standing**

Next, defendants allege that plaintiffs will not be able to succeed on their claim for an injunction because they lack standing to seek such an injunction. This argument was addressed above. Under the aforementioned analysis, the Court finds that plaintiffs do have standing to bring this injunction.

**c. Actual Recovery**

Next, defendants argue that even if plaintiffs establish standing, they will not be able to recover prospective relief because they are not likely to establish "that a credible threat exists that they will again be subject to the specific injury for which they seek injunctive or declaratory relief." *Buritica v. United States,* 8 F.Supp.2d 1188, 1196 (N.D.Cal. 1998). What defendants argue here is that the plaintiffs will not be able to succeed on the merits of the injunction.

■ In considering a motion for class certification, the Court should not make a preliminary determination on the merits of the action. *See Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Indeed, in determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *See id.* at 177–178, 94 S.Ct. 2140. As such, the Court is bound to take the substantive allegations in the complaint as true. *See Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975).

The complaint alleges that plaintiffs fear that they will be deprived again of all decency and privacy, and be forced to endure inhumane pain, cramps and indignity while forced to withhold voiding of urine and feces. *See* Consolidated Pls.' First Am. Compl. at 6, 7–8, 9–10. On its face, the complaint alleges enough to sustain plaintiffs' demand of injunctive relief. As such, a discussion of the merits of plaintiffs' claim is inappropriate at this juncture.

### 6. DEFINITION OF THE CLASS

Therefore, the Court finds that plaintiffs have met all the requirements to warrant class certification in this case. However, the class sought is certified only with respect to the injunctive portion of the case. Namely, the class is composed of all individuals who are currently incarcerated, or will be incarcerated during the pendency of this lawsuit, in the Ventura County jail, and who are subject to being restrained in the Pro-straint chair in violation of their Eighth Amendment rights. Issues of damages for past use of the chair will be addressed individually.

### C. PRELIMINARY INJUNCTION

### 1. LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS.

The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The limited record usually available on these motions renders a final decision on the merits inappropriate. *See Brown v. Chote*, 411 U.S. 452, 456, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973).

In the Ninth Circuit, two interrelated tests exist for determining the propriety of the issuance of a preliminary injunction. Under the first test, the Court may not issue a preliminary injunction unless: (1) the moving party has established a strong likelihood of success on the merits; (2) the moving party will suffer irreparable injury and has no adequate remedy at law if injunctive relief is not granted; (3) the balance of hardships

tips in favor of the movant; and (4) granting the injunction is in the public interest. *See Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 674–75 (1984); *Greene v. Bowen*, 639 F.Supp. 554, 558 (E.D.Ca.1986). An alternative articulation of the test is whether the moving party "meet[s] its burden by demonstrating either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor." *Martin*, 740 F.2d at 675. The two tests are not, however, separate and unrelated. Each represents the "extremes of a single continuum." *Benda v. Grand Lodge of Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir.1978).

### 2. APPLICATION

#### a. Likelihood of success

Plaintiffs here are pre-trial detainees who allege violations of their Eighth and Fourteenth Amendment rights. Claims by pre-trial detainees are analyzed under the Fourteenth Amendment Due Process Clause rather than under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, because pre-trial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, courts apply the same standard. *See Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir.1998).

The history of the constitutional prohibition of "cruel and unusual punishment" has been recounted at length in prior Supreme Court opinions and need not be repeated here. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia*, 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). It suffices to say that the primary concern of the Drafters was to prohibit tortures and other barbarous methods of punishment. *See Estelle*, 429 U.S. at 102, 97 S.Ct. 285. More recent cases, however, have held that the Amendment "proscribes more than physically barbarous punishments." *See Gregg*, 428 U.S. at 171, 96 S.Ct. 2909. The Amendment embodies "broad and idealistic concepts of dig-

nity, civilized standards, humanity and decency ... against which we must evaluate penal measures. Thus, [the Supreme Court] ha[s] held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle*, 429 U.S. at 102, 97 S.Ct. 285 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)). Furthermore, the Supreme Court has also held that the Amendment protects from punishments which "involve the unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173, 96 S.Ct. 2909. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id.* at 183, 96 S.Ct. 2909; *Estelle*, 429 U.S. at 103, 97 S.Ct. 285; *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 101, 78 S.Ct. 590 (plurality opinion). In *Spain v. Procunier*, 600 F.2d 189, 197 (9th Cir.1979), the Ninth Circuit upheld an injunction against the Director of the California State Department of Correction, thereby prohibiting the Director from using mechanical restraining devices[4] on prisoners when they traveled from a high-security area of the prison for court appearances or family visits. *See id.* The trial court in that case found that the use of these devices for all out of cell movement was "dehumanizing" and that it was cruel and unusual punishment. *See id.* The Ninth Circuit agreed with the trial court's determination and held that "[i]f the physical or mental pain that results [from the use of neck chains] is cruel and unusual, it is a violation of the Eighth Amendment regardless of the intent or the purpose of those who inflict it." *See id.*[5] In conclusion,

the court held that mechanical restraints could not be used to punish inmates. *See id.* at 198.

In light of that standard, the Court analyzes defendants' use of the Pro-straint chair to determine whether plaintiffs have a strong likelihood of success on the merit of their Fourteenth Amendment claim. Plaintiffs, through Katherine Burns, reviewed and summarized documents provided by the VCSD in discovery. *See* Burns Decl. at 5. These documents covered an eighteen month period and consisted of (1) Jail Incident Reports, (2) Inmate Monitoring Logs, and (3) California forensic medical group records. *See id.* at 5. These three types of documents catalog the instances when the deputy sheriffs used the Pro-straint chair. *See id.* at 5. Burns's review of the material showed that from May 1, 1996 to December 1, 1997, the Pro-straint chair was used 377 times. *See id.* at 5.

Burns divided the data into two major categories: (1) arrestees whose record did not reveal a history of mental health problems; and (2) arrestees who did. *See id.* at 5. Out of the 202 persons who were restrained in the chair who did not have a history of mental health problems, 196 of them were restrained only once. *See id.* The other six of them were confined on multiple occasions. *See id.* In total, the documents reflected that the chair was used 258 times. *See id.* at 6. Out of those 258 occasions, Burns found that there were only three occasions where the arrestees showed signs of "violence toward another" or "fighting." *See id.* at 6. Other explanations for confining arrestees to the chair were "kicking cell walls," "bad attitude," "resistance," or conduct which allegedly occurred during arrest but not in the presence of the deputies. *See id.* at 6. Furthermore, plaintiffs' review of the documents showed that out of those 196 persons who were placed in the chair only once, 168 were in the chair more

---

**4.** The "mechanical restraining devices" referred to in *Spain* were: handcuffs, a waist chain to which the cuffs were attached by a chain, leg manacles, and a neck chain consisting of a chain attached to the back of the waist chain and extending over one shoulder, across the neck, over to the other shoulder and down the back.

**5.** The Ninth Circuit did, however, differ in opinion as to the scope of the remedy granted by the trial court.

than three hours; 33 were in the chair more than eight hours; 16 persons were kept in the chair between eight and ten hours; and 17 persons were kept in the chair between ten and twenty hours. *See id.* at 6.

Out of the 72 people who were restrained in the chair and had a history of mental health problems, 60 of them were placed in the chair only once while twelve 12 of them were placed in the chair on multiple occasions. *See id.* at 6. In total, the documents reflected that the chair was used 119 times. *See id.* The reasons for restraint were predominantly for "kicking cell walls," "bad attitude," or "resistance." *See id.* at 8. Only one incident reports "violence toward another." *See id.* at 8. Furthermore, out of the arrestees who were placed in the chair only once, 26 were restrained for six hours or more; 8 were restrained between six and eight hours; 10 persons were kept in the chair between eight to ten hours; 6 persons between ten and twenty hours; and 2 persons for over twenty hours. *See id.* According to one report, an arrestee was restrained for almost thirty-five hours because he allegedly continued to use a buzzer to speak to a sergeant. *See id.* at n. 18.

Additionally, plaintiffs provided evidence that there are times when detainees are forced to either withhold bowel movements, or are left to sit in their own feces and urine for hours. *See* Maciel Dep. at 87, Ex. 5, attached to Pls.' Consolidated Mot. for Prelim. Inj. Some have no choice but to defecate and urinate on themselves while sitting in the chair. *See* Ball Decl. at 8 ("it is seldom that an inmate defecates or urinates on himself"); Worthy Decl. at 6 ("there may have been a few occasions where an inmate urinated while sitting in the chair").

Nonetheless, defendants argue that the use of the chair is the "most reasonable method invented to date" to control violent individuals. Ball Decl. at 1. They also argue that it was "designed as a humane, violent-prisoner restraint device." Ball Decl. at 4. Furthermore, Deputy Worthy states that the chair is used "only as a last resort for an extremely violent or combative inmate." Worthy Decl. at 6. The plaintiffs, and the

VCSD's own documents, however, tell another story.

As to the named plaintiffs, Stringer was not placed in the chair "as a last resort for an extremely violent or combative inmate." When Stringer was brought in the County Jail, Stringer was originally placed in the safety cell at 4:03 a.m. because of some suicidal statements he allegedly made. *See* Defs.' Ex. Sup. Opp'n Prelim. Inj., Ex. L. At 7:20 a.m., Stringer was observed lying peacefully. *See id.* Within ten minutes, however, Stringer was "kicking the wall" of the safety cell. *See id.* When he was told to stop, Stringer yelled "fuck you" at the deputy. *See id.* He was told to stop yelling by one of the deputies, at which point Stringer allegedly stood in a "fighting stance." *See id.* Apparently frightened by Stringer's "fighting stance" behind a locked metal door, the officers felt it was then necessary to place Stringer in the Pro-straint chair. However, about twelve minutes after he was placed in the chair, Stinger was observed sleeping. *See id.* All the reports afterwards describe Stringer as drinking water, talking, or just being quiet. *See id.* Yet, he was released from the chair at 12:18 p.m., or almost five hours after he was placed there. *See id.* These observations, taken directly from the defendant's documents, do not describe the behavior of a combative, violent, out of control inmate for which the chair is intended.

As to Pratt, the Jail Incident Report states that Pratt had been combative with the arresting officers. *See* Defs.' Ex. Sup. Opp'n Prelim. Inj., Ex. M. After he was brought in, the report states that he appeared "agitated." *See id.* The report further states that Pratt "would not follow instructions" when deputies attempted to remove his handcuffs. *See id.* However, Pratt had shown no signs of violence toward the deputies at the county intake facility. *See id.* Nevertheless, Pratt was placed in the Pro-straint chair. *See id.* The only reported incidents of "violence" on the part of Pratt occurred while the deputies tried to place him in the chair. *See id.*

As to Von Colln, the Jail Incident Report states that Von Colln was hitting his fist against the cell window. *See* Defs.' Ex. Sup.

Opp'n Prelim. Inj., Ex. K. The report further states that Von Colln then removed all his clothes. *See id.* When he was told to put his clothes back on, Von Colln allegedly refused. *See id.* Two deputies walked in the cell to force him to put his clothes on. *See id.* Von Colln then allegedly raised his hand, which prompted the deputies to take him to the ground. *See id.* As a result, Von Colln was placed in the chair, naked. *See id.* He was placed in the chair at 7:29 a.m. *See id.* The observation log shows that after he was placed in the chair, Von Colln was "sitting," "looking up," "talking," and "singing." *See id.* Yet, he was removed from the chair at 1:10 p.m., almost six hours after being placed there. *See id.*[6]

In addition to the named plaintiffs' accounts, according to the sheriff's own documents, placement in the chair was justified by a lot less than combativeness or extreme violence. For example, arrestees were placed in the chair for "banging on windows," "pounding on glass," "kicking door," "uncooperative[ness]," "banging on walls, bunk and doors," "exhibiting bizarre behavior, fail[ing] to respond to commands, [and] self-destructive[ness]," "banging on door," "bizarre behavior," "possible seizures," "threats to staff and [ ] cell door would not lock," "pounding on door, threaten[ing] staff and refus[ing] to follow commands," "creating disturbance, threats," and so on. *See* Defs.'s Ex. Sup. Opp'n Prelim. Inj., Ex. Q. These are signs of bad attitude, not signs of violence. To use the chair because the arrestee has a bad attitude is tantamount to using the chair as a form of punishment.

■ However, the preliminary finding that there are ongoing violations of the Eighth/Fourteenth Amendment does not automatically require that an injunction be issued to stop the conduct. *See Easyriders Freedom,* 92 F.3d at 1500. "[P]rinciples of equity, comity, and federalism ... should inform the judgment of federal courts when asked to oversee state law enforcement authorities." *Lyons,* 461 U.S. at 112, 103 S.Ct. 1660. In order to enjoin a state agency, the

Supreme Court requires a showing of an intentional and pervasive pattern of misconduct. *See Easyriders,* 92 F.3d at 1500. "Such a pervasive pattern of misconduct can be demonstrated by showing 'that the police misconduct flowed from a policy [or] plan.'" *See id.* (quoting *Thomas v. County of Los Angeles,* 978 F.2d 504, 508 (9th Cir.1992)). Such showing has preliminarily been made here. There is a written policy in effect for the use and operation of the Pro-straint chair. *See* Pls.' Ex. 3. Sergeant Maciel, the person designated as "most knowledgeable" on the use and misuse of the chair, testified that the policy of using the chair is developed solely by the Ventura County Jail. *See* Maciel Dep. Although the policy prohibits the use of the chair for punishment purposes, the term "punishment" itself is not defined in the policy, thereby giving the supervisors—who are present whenever an inmate is to be placed into the Pro-straint chair—full discretion in the use of the chair. *See* Maciel Dep. at 37; Pls.' Ex. 3. Additionally, the policy does not provide for maximum allowable time spent on the chair, thereby giving supervisors full discretion as to how long arrestees remain restrained. *See* Pls.' Ex. 3. Finally, according to Sergeant Maciel, the policy allows deputies to require restrained arrestees to either urinate or defecate on themselves and be forced to sit in their own feces or "hold it." *See* Maciel Dep. at 80, 87 ("Q. And those guidelines have no provisions for allowing inmates to urinate or defecate when they are placed on the chair; is that true? A. They can urinate and defecate in that chair."). Moreover, the data compiled by Burns preliminarily shows that the VCSD's misuse of that chair flows from a practice of restraining non-violent arrestees for extended periods of time in violation of the arrestees' Fourteenth Amendment rights.

As such, plaintiffs have shown a strong likelihood of success on the merits. The parties should bear in mind, however, that the Court is not making a final determination as to whether the use of the chair by the VCSD violates the Fourteenth Amendment.

---

**6.** The VCSD did not provide any documentation relating to Lloyd's confinement in the chair because, according to the complaint, they were either lost, destroyed, or never made. *See* Consolidated Pls.'s First Am. Compl. at 10

According to the evidence that was presented to it, the Court is only able to assess the likelihood of plaintiffs' success on this limited record.

#### b. Irreparable Injury

Defendants argue that plaintiffs are not entitled to a preliminary injunction because they cannot show that they stand to suffer irreparable injury for which there would be no adequate remedy at law. *See* Defs.' Mem. P. & A. Opp'n Prelim. Inj. at 15. Defendants do not argue that pain and suffering is not irreparable harm, nor could they. Rather they argue that the *named* plaintiffs, who are no longer incarcerated in the Ventura County jail, are not subject to being placed in the chair, and therefore are unlikely to face irreparable injury if the injunction is not granted.

To support their contention, defendants cite to *Nava v. City of Dublin*, 121 F.3d 453 (9th Cir.1997). The Court in *Nava* held that even though a plaintiff may have standing to seek an injunction, his ability to actually obtain equitable remedies depends on his ability to make " 'a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real and immediate threat that the plaintiff will be wronged again—a "likelihood of substantial and immediate irreparable injury." ' " *Nava*, 121 F.3d at 459 (quoting *Lyons*, 461 U.S. at 111, 103 S.Ct. 1660 (citations omitted)). That principle has universally been recognized in virtually all circuits, and this Court is in no position to disagree with it. However, defendants seem to rely on one particular phrase in *Nava* which states that "[e]ven in the face of unconstitutional conduct on the part of state law enforcement officers, an injunction may not be issued to halt that conduct absent a great and immediate threat that the *named* plaintiff will suffer irreparable injury for which there would be an inadequate remedy at law." *Nava*, 121 F.3d at 458 (emphasis added) (citing *Easyriders Freedom*, 92 F.3d at 1495–96 & n. 5, 1500). However, neither the *Nava* court, nor the *Easyriders Freedom* Court, had before it a certified class. Therefore, any mention of irreparable harm to the *named* plaintiff is dicta.

Here, the plaintiff class has been certified as "all individuals incarcerated during the pendency of this lawsuit, in the Ventura County Jail, and who are subject to being restrained in the Pro-straint chair in violation of their Fourteenth Amendment rights." Certainly, these putative plaintiffs are subject to a real and immediate threat that they will be wronged by being placed in the chair. Therefore, plaintiffs have met that prong as well.

#### c. Balance of Hardships

The balance of hardships here tips in favor of plaintiffs. The Ventura County Jail has three "padded" or "safety cells" which are barren of furnishings on which arrestees can injure themselves. *See* Sullivan Decl. at 8. Furthermore, the Ventura County jail also has two "detoxification cells" which, like the three safety cells, are situated for ease of access and use. *See id.* at 8. Furthermore, the Court presumes that the Ventura County jail possesses the full panoply of handcuffs, leg irons, and other alternative restraining devices. Therefore, the Ventura County Jail is not without means to safely restrain arrestees. Additionally, the VCSD owns no more than five Pro-straint chairs, thereby minimizing any hardship an injunction may cause. *See* Maciel Dep. at 25 ("at least three in the pre-trial facility"); Worthy Decl. at 5 ("four or five"). On the contrary, hardship to the putative plaintiffs is great. Unless the injunction is granted, they will suffer pain and suffering in violation of their constitutional rights.

#### d. Public Interest

Fourteenth Amendment considerations dictate that the public interest would be best served by granting the injunction. Furthermore, the safety of the VCSD deputies will not be compromised by the injunction. As discussed above, the deputies have other methods of restraint that they can use for truly violent arrestees.

### C. SCOPE OF PRELIMINARY INJUNCTION

Having decided that plaintiffs are entitled to a preliminary injunction, the Court must now decide the scope of such injunction.

This Court must ensure that "the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law." *Easyriders Freedom,* 92 F.3d at 1496. This requires the scope of the injunction to be no broader than necessary to provide complete relief to the named and putative plaintiffs. *See id.; Meinhold v. United States Dep't of Defense,* 34 F.3d 1469, 1480 (9th Cir.1994).

The plaintiffs allege that the chair is being used as a form of punishment for extended periods of time in violation of arrestees' constitutional rights. As such, they seek a full enjoinment of the use of the chair. The Court does not believe, at this stage of the litigation, that the chair *itself* is an unconstitutional restraint. However, the policies associated with the use of the chair by the VCSD raise serious constitutional questions. Therefore, it is the unlawful practices which must be enjoined. However, this presents a dilemma. On one hand, the Court may not issue an injunction which is too broad so as to "overcompensate" plaintiffs, and on the other the Court does not wish to run the everyday operations of the Ventura County Jail. In light of this dilemma, and in light of the fact that this injunction is temporary, the Court enjoins the VCSD from using the Prostraint chair in any way until a full trial on the merits.

## D. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants claim that they are entitled to summary judgment as to all causes of actions because (1) the Eleventh Amendment bars the suit against the Sheriff and Ventura County, (2) the VCSD is not an entity subject to suit;[7] and (3) that defendants are also entitled to summary judgment as to the Fourth Cause of action because it is based on international treaties which do not provide a proper basis for a private right of action.[8]

## 1. STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The moving party for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact would find other than for the moving party. Conversely, on an issue for which the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Where the operative facts are substantially undisputed, and the heart of the controversy is the legal effect of such facts, such a dispute effectively becomes a question of law that can, quite properly, be decided on summary judgment. *See Odle v. Heckler,* 707 F.2d 439, 440 (1983). However, summary judgment should not be granted where contradictory inferences may be drawn from undisputed facts. *See Braxton–Secret v. A.H. Robins Co.,* 769 F.2d 528, 531 (1985). In such a case, the non-moving party must show that the inferences it suggests are reasonable in light of the competing inferences. *See Matsushita Elec. Indus. Co. v. Zenith*

---

7. The Consolidated Plaintiffs' First Amended Complaint, which did not name the VCSD as a defendant, makes this issue moot.

8. The Consolidated Plaintiffs' First Amended Complaint, which did not reassert a claim under international law, makes this issue moot. Furthermore, that point is not opposed by plaintiffs.

*Radio Co.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## 2. APPLICATION

### a. ELEVENTH AMENDMENT CONSIDERATIONS

#### i. Injunctive Relief

■ As a preliminary matter, the Court recognizes that plaintiffs are seeking different remedies: injunctive and monetary. Defendants' argument that the Sheriff *ex officio* is immune from suit—although arguable as to the damage claim—must fail as to the injunctive relief sought because such argument is inconsistent with clear precedent from the Supreme Court, which has allowed injunctive relief against even state officials. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 n. 3, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' ") (quoting *Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). As such, the summary judgment motion, as it relates to the injunctive relief, and as it is based on Eleventh Amendment grounds, is denied.[9]

#### ii. Claims for Damages

■ As to the claims for damages, the United States Supreme Court held in *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) that a local government is liable under section 1983 for its policies that cause constitutional torts. *See McMillian v. Monroe County,* 520 U.S. 781, 784, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). "These policies may be set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.' " *See id.* at 784–85, 117 S.Ct. 1734 (quoting *Monell,* 436 U.S.

at 694, 98 S.Ct. 2018). As such, this Court's task is to identify those officials "who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Id.; Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Therefore, the dispute here is whether the county or the state is the final policymaker as to the conduct complained of by plaintiffs. Such a determination is a matter of law. *See Pitts v. County of Kern,* 17 Cal.4th 340, 357, 70 Cal.Rptr.2d 823, 949 P.2d 920 (1998).

In deciding this dispute, the *McMillian* Court instructs this Court to guide its inquiry according to two principles. *See McMillian,* 520 U.S. at 785, 117 S.Ct. 1734. First, the Court must look at the specific activity at issue and determine whether the Sheriff acts as a state or county policymaker in that respect only. *See id.* at 785–86, 117 S.Ct. 1734. Second, the Court must analyze state law to determine whether the official has "final policymaking authority." *See id.* at 786, 117 S.Ct. 1734 (citing *Jett,* 491 U.S. at 737, 109 S.Ct. 2702).

The specific activity at issue here is the day-to-day operation of the County Jail. Therefore, the Court must determine whether the Sheriff acts as a county or state policymaker in that respect only. The California Court of Appeals has already had the opportunity to address whether the Sheriff was a state or county officer in some respects. *See County of Los Angeles v. Superior Court,* 68 Cal.App.4th 1166, 80 Cal. Rptr.2d 860 (1998) (*Peters* ). In that case, the California court ruled that the Sheriff was acting pursuant to his "law enforcement function" when he refused to release an inmate who may have been subject to an outstanding warrant. *See id.* at 1177, 80 Cal. Rptr.2d 860.[10] The fact that the Sheriff was

9. Needless to say, because former Sheriff Carpenter is no longer the Sheriff *ex officio,* he is no longer subject to injunctive relief.

10. In *Peters,* the court heavily relied on *Pitts v. County of Kern,* 17 Cal.4th 340, 70 Cal.Rptr.2d 823, 949 P.2d 920 (1998). That case stood for the proposition that county prosecutors, when

prosecuting criminal cases, and therefore acting in their law enforcement capacity, were acting under color of state law. *See id.* at 356–58, 70 Cal.Rptr.2d 823, 949 P.2d 920. This was evidenced by the fact that the Attorney General had direct supervisory authority over the county prosecutors when they acted in their law enforcement function. *See id.* The *Peters* court

acting pursuant to his law enforcement function in relying on a warrant made the Sheriff a state actor.[11] That case, however illustrative, is not controlling here. The acts complained of in the instant complaint do not arise out of the Sheriff's law enforcement functions, but rather out of his "responsibility for operating jails." *See* Cal. Pen.Code § 4000. Part of that responsibility involves the making of policies for the keeping of inmates and arrestees.

Furthermore, an analysis of California law shows that the sheriff acts as a county policymaker in his operation of the jails. California Government Code section 24000(b) states that the Sheriff is a county officer. *See* Cal. Gov.Code. § 24000(b). Furthermore, California law states that the "board of supervisors shall supervise the official conduct of all county officers." Cal. Gov.Code § 25303. This supervisory power does not apply, however, when the Sheriff exercises his independent investigative and prosecutorial functions. *See id.* Because the day-to-day operation of the county jail is not part of the Sheriff's investigative or prosecutorial functions, the board of supervisors maintains supervisory authority over the Sheriff's day-to-day operation of the county jail under California law.[12]

It is also clear that the state does not actually exercise supervisory authority over the Sheriff's use of the chair. Indeed, Sergeant Maciel testified that the Attorney General did not provide the VCSD with any policy regarding the use of the chair and that there were no state laws that cover any policies on the use of the chair. *See* Maciel Dep. at 79. Furthermore, "[t]here are no guidelines to remove an inmate from the chair other than relying on [a] supervisor's judgment." *Id.* at 46. Additionally, when asked if that "policy that the supervisors are to exercise their discretion to release people placed in the chair . . . was developed by the Ventura County Sheriff's Department," Sergeant Maciel answered "Yes." *Id.* at 78. Finally, Sergeant Maciel confirmed that there was "no other agency involved in the development of the policy." *Id.* at 36.

Having determined the specific activity at issue and that the Sheriff acts as a county policymaker in that respect, the Court now analyzes whether state law provides the sheriff with *final* policymaking authority over the operation of the county jails, and especially over the use of the Pro-straint chair. To comport with the rationale expressed in *McMillian,* and to ultimately

then analogized that when county sheriffs act in their law enforcement capacity, they too are acting under color of state law. *See Peters,* 68 Cal.App.4th at 1171, 80 Cal.Rptr.2d 860.

**11.** Defense counsel urges this Court that *Peters* stands for the proposition that sheriffs are immune from civil rights lawsuits both when acting in their law enforcement function and when they are acting in the day-to-day management of their jail. As discussed above, the Court does not read *Peters* quite as broadly as defendant does. In any event, even if *Peters* stood for the proposition that sheriffs are immune from civil rights lawsuits which result from their conduct in running the day-to-day operations of a jail, this Court rejects that holding, as it clearly violates the analytical framework enunciated by the Supreme Court in *McMillian.*

**12.** Defendants argue that the board of supervisors has no right to control the operations of the jail. To support their argument, defendants cite to *Brandt v. Board of Supervisors,* 84 Cal.App.3d 598, 147 Cal.Rptr. 468 (1978). *Brandt,* however, stands for the proposition that a board of supervisors cannot be required to comply with certain sections of the California Administrative Code

concerning the number and training of correctional officers because it has no duty to hire or train these officers but rather only has the duty to appropriate sufficient funds for the cost thereof. *See id.* at 600, 147 Cal.Rptr. 468. The court did hold, however, that the sheriff, as a county officer, could be required to do so. *See id.* Having determined that there was no such duty on the part of the board of supervisors, the court found that the board of supervisors was not subject to the injunction. Having determined that no duty existed, the court did not need to go any further. However, in dicta, the court did state that the board of supervisors had no direct authority to use its *budgetary power* to control employment in or operation of the sheriff's office. *See id.* at 602, 147 Cal.Rptr. 468. This is true because the authority to hire deputies was vested with the Sheriff himself. *See* Cal. Gov. Code § 26602. Nevertheless, such dicta does not negate the fact that the board of supervisors has (1) control over how much funding the Sheriff's office receives and (2) supervisory authority over the Sheriff when he acts in his official capacity. *See* Cal.Gov.Code. § 25303 ("Nothing contained [in this section] shall be construed to limit the budgetary authority of the board of supervisors over the . . . sheriff.").

come to a conclusion as to whether the Sheriff is a state or county actor when it uses the Pro-straint chair in its operation of the county jails, this Court must analyze the California laws that are analogous to the Alabama state sources examined by the Supreme Court in *McMillian* and employ the following five factors to determine whether a governmental official or entity is an arm of the state: "(1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued in its own name; (4) whether the entity has authority to hold property in its own name; and (5) whether the entity has the corporate status of a state agency." *Eaglesmith v. Ward,* 73 F.3d 857, 860 (9th Cir.1995).

The Ninth Circuit has stated that the first factor, relating to who is legally obligated to pay the judgment, is the most important factor in the analysis. *See Hyland v. Wonder,* 117 F.3d 405, 413 (9th Cir.1997). Here, there is no evidence which would suggest that any judgment against the county sheriff and personnel in their official capacities would come out of the state coffers.[13] On the contrary, the evidence on the record shows that the State of California is not a party to this action, that the Sheriff did not cross-claim against the state, and that the state did not intervene to protect its interest. The Court therefore finds that this factor weighs heavily against a finding that the Sheriff and his personnel are arms of the state for the action complained of here. As to the second factor, the function of overseeing county jails belongs to the Sheriff, not the state. California statutory law provides that the Sheriff has the "responsibility for operating jails in this state." *See* Cal. Pen.Code § 4000. Furthermore, the law also provides that the "sheriff shall take charge of and be the sole and exclusive authority to keep the county jail and prisoners in it." Cal. Govt. Code § 26605. Finally, although the last three factors are the least instructive, the Court notes that at least two out of the three cut

against the sheriff's assertion of immunity. The VCSD may be able to sue or be sued in its own name,[14] but it cannot hold property, nor does it have a corporate status.

In conclusion, an analysis of California law and the admissions of Sergeant Maciel support the conclusion that the Sheriff is the final policymaker as it relates to the use of the Pro-straint chair. Additionally, the analysis of the five factors set out in *McMillian* also reveal that the Sheriff is the final policymaker concerning the use of the chair.

### b. THE VENTURA COUNTY SHERIFF'S DEPARTMENT AS AN ENTITY SUBJECT TO SUIT

Defendants summarily argue that the inclusion of the VCSD is improper because, under California law, for purposes of a lawsuit for damages, a governmental entity is indivisible. To support their argument, defendants cite to *Bauer v. County of Ventura,* 45 Cal.2d 276, 288, 289 P.2d 1 (1955); *Sheehan v. Board of Police Commissioners,* 188 Cal. 525, 532, 206 P. 70 (1922); and *Talbot v. City of Pasadena,* 28 Cal.App.2d 271, 274, 82 P.2d 483 (1938). The Consolidated Plaintiffs' First Amended Complaint did not name the VCSD as a party to this lawsuit. As such, this argument is moot.

### c. ALLEGATIONS OF TORTURE UNDER INTERNATIONAL LAW

Plaintiffs' first amended complaint claimed that defendants are liable for violation of the Convention Against Torture and Other Cruel, Inhuman, and Degrading Treatment or Punishment, the International Covenant on Civil and Political Rights, and the customary international law prohibition against such conduct. Defendants moved for summary judgment stating that these alleged violations do not give rise to a private cause of action under 42 U.S.C. § 1983. However, plaintiffs did not reassert the aforementioned cause of action in the Consolidated Plaintiffs' First Amended Complaint. Therefore, this argument is altogether moot.[15]

---

**13.** Defense counsel admitted as much in the November 1, 1999 hearing.

**14.** Defendants had argued that the VCSD could not sue or be sued in its own name.

**15.** Additionally, resolution of defendants' motion for summary judgment in plaintiffs' favor ren-

### E. DEFENDANTS' MOTION TO DISMISS NEWLY ADDED DEFENDANTS AND TO DISMISS CERTAIN DEFENDANTS IN THE CAPACITIES IN WHICH THEY WERE SUED

Defendants argue that the addition of defendants Smith, Johnson, Ilano, and Werre in the Consolidated Plaintiffs' First Amended Complaint violate Rule 4 of the Federal Rules of Civil Procedure. The motion also argues that former Sheriff Carpenter, current Sheriff Brooks, and Chief of Detention Ken Kipp, as sued in their personal and official capacities, should be dismissed. That last motion is presumably based on Rule 12(b)(6).[16]

This motion arises out of the "consolidated Plaintiffs' First Amended Complaint for Damages and Injunctive Relief" filed on September 1, 1999 whereby the four consolidated plaintiffs added defendants Smith, Johnson, Ilano, and Werre. Defendants stipulated to the filing of that complaint and waived further service.

#### 1. RULE 4(m)

Rule 4(m) provides that

[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time.

Fed.R.Civ.P. 4(m).

As part of the aforementioned stipulation, defendants waived further service of the Consolidated Plaintiffs' First Amended Complaint. Nevertheless, defendants now challenge service of the complaint on the newly added defendants. By their stipulation, however, defendants have waived any defect in the service of the complaint, and as such, may not move under Rule 4.

Defendants did reserve the right to question the propriety of any newly added defendants. However, Rule 4 is not the proper vehicle to do so at this stage of the litigation. As such, defendants' motion to dismiss the newly added defendant based on Rule 4 is denied.

#### 2. DISMISSAL OF DEFENDANTS CARPENTER, BROOKS, AND KIPP IN THEIR PERSONAL CAPACITIES

Defendants also move to dismiss defendants Carpenter, Brooks, and Kipp in their personal capacities claiming that the complaint does not allege that they directly participated in the alleged violations of plaintiffs' constitutional rights. This motion is, in essence, a Rule 12(b)(6) motion.

##### a. STANDARD

Rule 12(b)(6) provides for dismissal when a complaint fails to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6). A complaint fails to state a cause of action if it does not allege facts necessary to support a cognizable legal claim. *See Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984).

In reviewing a Rule 12(b)(6) motion, a court must presume the truth of factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *See Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995); *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Dismissal under Rule 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (dismissal appropriate only where "plaintiff can prove no set of facts in support of his claim which would entitle him to relief")); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d

---

ders plaintiffs' objections to defendants' evidence and plaintiffs' motion to strike defendants' motion for summary judgment moot.

**16.** The Court uses "presumably" because the grounds for the motion were never stated either in the notice of motion nor in the memorandum of points and authorities.

1149, 1152 (9th Cir.1989). The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the plaintiff's claim. *See Usher*, 828 F.2d at 561.

### b. APPLICATION

 It is clear that prison officials can be liable in their personal capacities under Section 1983 if their conduct causes the violation. *See McRorie v. Shimoda*, 795 F.2d 780, 783–84 (9th Cir.1986). As such, prisoners can state a claim against prison personnel under section 1983 "by establishing that prison personnel acted with 'deliberate indifference' in creating the condition that violates the Eighth Amendment." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.1988) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)).

The complaint alleges that defendants Carpenter, Brooks, and Kipp disregarded the unconstitutional conduct of the deputies and failed to adequately investigate and discover and correct such unconstitutional conduct, which "caused the violation of the plaintiffs' constitutional rights." *See* Consolidated Plaintiffs' First Amended Complaint at 12. Additionally, plaintiffs allege that the instant defendants knew about this pattern of unconstitutional violations but failed to take steps to train, supervise, investigate, or instruct deputies and jailers, and as a result, plaintiffs were harmed. *See id.* Furthermore, plaintiffs allege that "the conduct alleged by the plaintiffs has been authorized and ratified by these defendants in their individual and official capacity." *Id.* at 13. These allegations support a claim that the prison personnel "acted with 'deliberate indifference' in creating the condition that violates the Fourteenth Amendment." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.1988) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)). Therefore, defendants' motion to dismiss is denied.

Additionally, defendants seem to argue that because the County of Ventura has been named as a defendant, the inclusion of Carpenter, Brooks, and Kipp in their official capacities is duplicative and unnecessary. However, these defendants are properly named defendants, at least as it relates to their personal capacity, and the Court therefore need not address this issue at this stage.

### V.  CONCLUSION

For the foregoing reasons, the Court orders that (1) plaintiffs' motion to certify the class is GRANTED as to the class defined in this opinion; (2) plaintiffs' motion for a preliminary injunction is GRANTED thereby prohibiting the Ventura County Jail from using the Pro-straint chair in any way; (3) defendants' motion for summary judgment is DENIED; (4) plaintiff's motion to strike defendants' motion for summary judgment is MOOT; and (5) defendants' motion to dismiss newly added defendants and capacities is DENIED.

**IT IS SO ORDERED.**